**SUN CAL, INC., d/b/a Sun Cal Properties, Inc., and Sun Cal Investments No. 9, Plaintiffs,**

**v.**

**The UNITED STATES, Defendant.**

**No. 558–85C.**

United States Claims Court.

July 10, 1990.

Alvin S. Kaufer, Los Angeles, Cal., for plaintiffs; John Ossiff of counsel.

George M. Beasley, III, with whom were Asst. Atty. Gen. Stuart M. Gerson and David M. Cohen, Director, Washington, D.C., for defendant; Mark Ramsey, Office of General Counsel, General Services Admin., of counsel.

## OPINION

ANDEWELT, Judge.

This government contract action involves a lease and construction contract (No. GSA–9B–82445) originally between the United States General Services Administration (GSA) and C–D Investment Co. (C–D). The contract covers an office building (LAX 7) at 5720 West 98th Street, Los Angeles, California. On October 25, 1984, GSA terminated the contract for default. Plaintiffs, Sun Cal, Inc. (Sun Cal), d/b/a Sun Properties, Inc., and Sun Cal Investments No. 9, Ltd. (SCI 9), which had acquired C–D's interests in LAX 7, disputed the termination. On March 1, 1985, plaintiffs filed a certified claim with the contracting officer seeking $12,098,800 in lost income under the lease and $339,547.98 in construction-related damages. In a May 1, 1985, final decision, the contracting officer denied plaintiffs' claim in its entirety. Plaintiffs filed the instant suit pursuant to the Contract Disputes Act, 41 U.S.C. § 601, et seq. (CDA).

Pursuant to the parties' request, on March 11, 1987, Judge Seto ordered that trial take place in distinct phases. After the case was transferred to this judge, the parties continued to support the process

outlined in Judge Seto's order. The first trial phase, which has been completed, focused on whether defendant had properly established a new construction completion date prior to terminating the contract for default. In its pretrial brief, defendant challenged for the first time this court's jurisdiction. It contended that this action should be dismissed because an assignment occurred in violation of 41 U.S.C. § 15 and 31 U.S.C. § 3727 (hereafter the Anti–Assignment Acts). In its post-trial brief, defendant added two additional jurisdictional challenges. It contended that plaintiffs had never filed a properly certified claim with the contracting officer and that, in any event, plaintiffs lacked privity of contract with the United States.

This decision initially will address the jurisdictional issues. After concluding that this court possesses jurisdiction, the court will discuss the merits of the action.

## I.

A prerequisite to this court's subject matter jurisdiction over a contract claim under the CDA is the contractor's submission to the contracting officer of a properly certified claim. *Ball, Ball & Brosamer, Inc. v. United States,* 878 F.2d 1426, 1428 (Fed.Cir.1989). Defendant contends that the claim submitted herein was jurisdictionally defective in a number of ways.

First, defendant contends that the claim was not certified by a qualified person. Section 605(c)(1) of the CDA states the following requirements for a claim over $50,000:

> For claims of more than $50,000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable.

While the CDA does not define which individuals may certify a claim for a contractor, the Federal Acquisition Regulations (FAR) do. FAR 33.207(c)(2) provides:

If the contractor is not an individual, the certification shall be executed by—
(i) A senior company official in charge at the contractor's plant or location involved; or
(ii) An officer or general partner of the contractor having overall responsibility for the conduct of the contractor's affairs.

48 C.F.R. § 33.207(c)(2) (1988). In *Ball,* the Court of Appeals for the Federal Circuit concluded, in effect, that for contracts subject to FAR, this court has jurisdiction to review a contracting officer's decision on a claim in excess of $50,000 only if the person certifying the claim qualifies under this regulation.

As explained below, plaintiff SCI 9, a Texas limited partnership, is properly considered the contractor herein. Plaintiff Sun Cal is the general partner of SCI 9. Under Texas law, "[a] limited partnership acts only through its general partner." *Tomlin v. Ceres Corp.,* 507 F.2d 642, 648 (5th Cir.1975). Hence, Sun Cal is the appropriate entity to act for limited partnership SCI 9 in the submission of a claim under SCI 9's contract. The claim presented herein was certified by Douglas J. Duffy, Vice President and Chief Financial Officer of Sun Cal. Both Duffy and the President of Sun Cal, Stanley R. Castleton, appeared as witnesses at trial and were subject to cross examination by defendant. Their testimony was supplemented by post-trial affidavits.

The record makes clear that Duffy's involvement with the contract extended well beyond the typical financial concerns of a Chief Financial Officer. Castleton gave Duffy overall authority and responsibility for the affairs of SCI 9. Duffy not only was responsible for financing the lease improvements but also had full authority and responsibility for the completion of the tenant improvements required under the lease, including negotiating changes and amendments to the lease such as changes in the construction schedule. The evidence viewed in its entirety indicates that Duffy was the Sun Cal official responsible for completion of the contract and that he qual-

ified under both provisions of 48 C.F.R. § 33.207(c)(2). First, while he was not located permanently at the lease site, Duffy spent sufficient time there to qualify as "[a] senior company official in charge at the ... location involved." Second, in any event, he qualified as "[a]n officer or general partner of the contractor having overall responsibility for the conduct of the contractor's [*i.e.*, SCI–9's] affairs."

Defendant contends that this second conclusion, that Duffy had "overall responsibility for the conduct of the contractor's affairs," is inconsistent with the bylaws of Sun Cal. Article V, ¶ 7 of the bylaws provides that the president, among other duties, "shall have general and active management of the business and affairs of the corporation." Article V, ¶ 8 defines the duties of the vice president as follows:

> 8. *Vice President.* The Vice President, unless otherwise determined by the Board of Directors, shall, *in the absence or disability of the President,* perform the duties and have the authority and exercise the powers of the President. He shall perform such *other* duties and have such *other* authority and powers as the Board of Directors may from time to time prescribe or as the President may from time to time delegate.

(Emphasis added.) Defendant argues, in effect, that under these by-laws, absent Castleton being sick or disabled or absent a vote of the Board of Directors, none of which has been established, Duffy could not assume "general and active management of the business and affairs of the corporation." But to qualify to certify the claim in issue herein, Duffy does not necessarily have to have overall responsibility over Sun Cal, which is the corporation to which the bylaws refer. FAR 33.207(c)(2) focuses on the relationship between the individual submitting the claim and the *contractor.* Here, the contractor is SCI 9, not Sun Cal. SCI 9 is only one part of Sun Cal's business. Hence, Castleton could delegate significant responsibility to Duffy over SCI 9 without giving up "general and active management of the business affairs of the corporation." Duffy's exercise of authority over SCI 9's affairs therefore is

consistent with Article V, ¶ 8 of the bylaws, which gives the vice president authority to "perform such other duties and have such other authority ... the president may from time to time delegate."

## II.

Next, in a separate attack on the adequacy of the certification, defendant criticizes Duffy for failing to employ the precise language used in 41 U.S.C. § 605(c)(1). The certification states as follows:

> The undersigned, the Vice President and Chief Financial Officer of Sun Cal Properties, Inc., the sole general partner of Sun. Cal Investments No. 9, Ltd., a Texas limited partnership (the "Contractor"), hereby certifies that the attached claim consists of estimates made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable. Schedule I demonstrates damages in the amount of $12,098,800 for breach of Lease No. GS–09B–82445. Schedule II demonstrates damages in the amount of $339,597.49 for damages incurred at the Government's request in construction of tenant improvements on the fifth floor of the subject building.

> SUN CAL INVESTMENTS NO. 9, LTD.

> a Texas Limited Partnership

> By: Sun Cal, Inc., general partner

> By: Douglas Duffy, Vice President and Chief Financial Officer

■ First, defendant faults Duffy for using the term "estimates." Defendant contends that under Section 605(c)(1), plaintiffs were required to certify that the "claim is made in good faith" and not that the "claim consists of estimates made in good faith." Defendant argues that "[e]stimates obviously relate only to the *quantum* aspect of the claim, and the certification fails to certify that the other, *liability* aspects of the claim were also made in good faith" (emphasis in original).

But the use of the term "estimates" in the certification does not contravene statutory requirements. The schedules submitted as part of the claim detail each monetary component of the total claim. To the extent that certain of these cost components could not be ascertained with certainty at the time the claim was filed, it was necessary to estimate them. Use of the term "estimates," therefore, does not mean that the contractor was not certifying to a good faith belief as to the government's underlying liability. Indeed, the "estimates" made are estimates of the amount of money plaintiffs allege defendant owes them under the contract. A statement that the estimates were made in good faith, therefore, necessarily includes a good faith representation that defendant is liable for payment of the estimated funds. Thus, read in its entirety, the certification demonstrates that the contractor was certifying a good faith belief as to both quantum and liability.

█ Defendant also faults Duffy for certifying that the supporting data are accurate "to the best of *his* knowledge and belief" (emphasis added), rather than to the best of the "contractor's" knowledge and belief. (Section 605(c)(1) states that "the contractor shall certify ... to the best of his knowledge.") Defendant contends that by shifting the representation to the affiant's personal belief as to the accuracy and completeness of the supporting data, plaintiffs undermine the congressional objective of triggering a contractor's liability for a fraudulent claim under Section 604 of the CDA. But on the facts of this case, the difference in language is not material. As shown above, the certification lists SCI 9 as the entity submitting the certification. Under the name "SUN CAL INVESTMENTS NO. 9, LTD." is "By: Sun Cal, Inc.," and under "By: Sun Cal, Inc." is "By: Douglas Duffy." As Vice President and Chief Financial Officer of Sun Cal, Duffy was in the best position to ascertain the accuracy of the supporting data and was authorized by Castleton to submit the claim for SCI 9. In view of this authorization, SCI 9 would not be relieved of liability for any fraudulent statements contained in Duffy's affida-

vit. *O'Brien Gear & Machine Co. v. United States*, 219 Ct.Cl. 187, 199, 591 F.2d 666, 672 (1979); *Wagner Iron Works v. United States*, 146 Ct.Cl. 334, 338, 174 F.Supp. 956, 958 (1959).

In *United States v. General Elec. Corp.*, 727 F.2d 1567, 1569 (Fed.Cir.1984), the Court of Appeals for the Federal Circuit accepted as proper a claim that did not track the precise language of the statute, stating: "[The] document, with attachments, contains the information and statements required by the statute and is in substantial compliance therewith." The same can be said of the instant claim. *See Todd Bldg. Co. v. United States*, 13 Cl.Ct. 587, 588 (1987), in which this court held sufficient a certification in which the certifier stated that "the supporting data are accurate and complete to the best of *my* knowledge and belief" (emphasis added).

## III.

█ Additional facts are necessary to evaluate defendant's contentions that this action should be dismissed on the grounds of lack of privity and violation of the Anti-Assignment Acts. Three relevant transactions preceded institution of this suit. The first transaction is the original lease and construction agreement entered in October 1983. C–D, a California general partnership, was the lessor in that agreement and GSA was the lessee. The second transaction, which occurred on or about August 29, 1984, was between Sun Cal and C–D. C–D transferred its 15 properties, including LAX 7, to 15 distinct limited partnerships. Sun Cal was the sole general partner for each limited partnership and C–D, or a C–D related entity, was the limited partner. SCI 9 is the limited partnership to which LAX 7 was transferred.

The third transaction occurred in March 1985. After the government had terminated the contract in issue and after SCI 9 had submitted the certified claim to the contracting officer, each of the 15 limited partnerships transferred the property previously transferred to it to general partner Sun Cal. Sun Cal named Sun Cal II, Inc., a

newly formed corporation, as the limited partner for each limited partnership, and then each limited partnership (including SCI 9) transferred all rights, title, and interest in its property to Sun Cal. Though it apparently no longer had any assets, SCI 9 remained in existence as a distinct entity, with Sun Cal the general partner and Sun Cal II the limited partner.

Turning to the issue of privity of contract, SCI 9 was not the original lessor and, hence, was not in privity of contract with defendant when the original lease was signed. But defendant did not object to the second transaction transferring LAX 7 from C–D to SCI 9, and thereafter had treated SCI 9 as the lessor. Defendant concedes that these post-transfer actions resulted in an implied-in-fact novation of the original contract and the creation of privity of contract between the government and SCI 9. *See Tuftco Corp. v. United States*, 222 Ct.Cl. 277, 286, 614 F.2d 740, 745 (1980). Thus, defendant's contention is not that SCI 9 was never in privity of contract with defendant but rather that the instant action should be dismissed because, in effect, subsequent circumstances resulted in the loss of privity. Defendant explains this argument in its post-trial brief is as follows:

> Accordingly, while there may originally have been privity of contract between defendant and SCI No. 9, as of the time this action was filed in September 25, 1985, the entity with whom defendant had originally contracted, [CD], had simply disappeared from the scene. The record does not reflect that the Government was given any notice of this change. While [SCI] 9 may continue to exist as a legal entity, as plaintiffs have contended by offering the certificate of status issued by the State of California ... as well as testimony ..., there is no evidence that it is a viable entity with any substantial assets, much less one which could respond to defendant's multimillion dollar claim which is the subject of the companion case, No. 801–87C.

This argument is novel, unsupported by any precedent, and ultimately wrong. Privity of contract does not depend on the financial viability or strength of a firm. Rather, it is "[t]hat connection or relationship which exists between two or more contracting parties." *Black's Law Dictionary* 1079 (5th ed. 1979). The required connection or relationship existed here and the nature of that relationship did not change simply because SCI 9's financial status deteriorated.

## IV.

In paragraph seven of the complaint, the third, March 1985 transaction, detailed above, is described as follows:

> As part of the reorganization of properties held by limited partnerships of which Sun Cal was the sole general partner, Sun Cal acquired ... all right, title and interest in and to the Property, Building 7 and the lessor's interest in the lease (including all rights and causes of action against defendant) from [SCI 9].

Assuming the correctness of the complaint allegation that Sun Cal had secured "all right and causes of action against defendant," defendant moves to dismiss the instant action on the ground that such a transfer would constitute an assignment of a claim in violation of the Anti–Assignment Acts.[1] Defendant contends that such an improper assignment would leave this court without jurisdiction over the claim.

But the evidence submitted at trial indicates that the claim against the United States was never assigned and indeed that there never was any attempt to assign it. The March 1985 transaction took the form of a partnership grant deed, and the deed relates exclusively to the property involved in that transaction. It does not refer to or purport to assign the pending claim against defendant. Since there never was an assignment of the previously filed cause of action against defendant, the claim remained with plaintiff SCI 9, who was in privity of contract with defendant.

---

1. 41 U.S.C. § 15 covers generally the transfer of rights in government contracts, and 31 U.S.C. § 3727 covers specifically the assignment of claims.

Moreover, jurisdiction would lie even if this court came to the contrary conclusion that plaintiffs had attempted to assign the claim. If the assignment to Sun Cal were valid, then the court would possess jurisdiction over the complaint because the assignee, Sun Cal, a plaintiff herein, would be the real party in interest. On the other hand, if the assignment were invalid, then the court would still possess jurisdiction because SCI 9, similarly a plaintiff herein, would be the real party in interest. When an attempted assignment of a claim against the government does not comply with applicable statutory requirements, it is void as against the government (*United States v. Gillis*, 95 U.S. 407, 24 L.Ed. 503 (1877); *Kingsbury v. United States*, 215 Ct.Cl. 136, 141, 563 F.2d 1019, 1022 (1977)),[2] and the cause of action remains with the entity that sought unsuccessfully to assign the claim. *See, e.g., Colonial Navigation Company v. United States*, 149 Ct.Cl. 242, 247, 181 F.Supp. 237, 240 (1960) ("[A]n attempted assignment of a claim against the United States does not forfeit the claim. It leaves the claim where it was before the purported assignment.") *See also* J. Steadman, D. Schwartz & S. Jacoby, *Litigation With The Federal Government* 291 (2d ed. 1983) ("The effect of the Act is upon the assignment, not upon the claim. The assignor can still bring suit."); *K & R Service Co. v. United States*, 568 F.Supp. 38, 40 (D.Mass.1983).[3]

### V.

Turning to the merits of plaintiffs' claim that were the subject of the trial,

plaintiffs contend that defendant's termination for default was not authorized because the original construction completion date had been waived and defendant failed to follow the procedures for reestablishing a new construction completion date. On this issue, the trial revealed the following facts.

Defendant entered into the lease in issue with C–D on October 5, 1983. The lease covered primarily three floors of LAX 7, which were to be occupied by the Defense Contract Administration Services Region. Commencement of the lease was conditioned on C–D constructing the interior of the space according to contract specifications and floor plans to be furnished by GSA.[4] The agreement, as amended, provided that construction (also referred to as build-out) would be completed in time to permit occupancy by February 1, 1984. The lease contained a liquidated damages clause that required the lessor to pay GSA $1,000 for each calendar day that delivery was delayed beyond the completion date. The lease also included a termination for default clause which provided, as follows:

> 46. *Termination for Default.* If the Lessor fails to prosecute the work required to deliver the leased premises ready for occupancy by the government agency with such diligence as will ensure delivery of the leased premises within the time required by the lease agreement, or any extension of the specified time, or if the lessor fails to complete said work within such time, GSA may, by written notice to the Lessor, terminate the lease agreement. Regardless of

---

2. Plaintiffs do not contend that SCI 9 complied with the specific requirements for an assignment under the Anti–Assignment Acts. But plaintiffs contend that the Anti–Assignment Acts would not apply to an assignment of the claim to Sun Cal during the course of the March 1985 transaction. Plaintiffs argue that the third transaction would fall within the business reorganization exception to the scope of the Anti–Assignment Acts articulated by the Supreme Court in *Seaboard A.L. Railway v. United States*, 256 U.S. 655, 657, 41 S.Ct. 611, 612, 65 L.Ed. 1149 (1921).

3. Defendant argues that if this court concludes, as it has, that SCI 9 is a proper plaintiff herein,

then the court must dismiss Sun Cal regardless of its economic interest in the outcome of this litigation. However, the parties touch on this issue only briefly in their briefs. If defendant chooses to pursue this point, it shall file a supplemental brief setting forth the details of its argument.

4. The term of the lease was ten years at an annual rent of $1,788,480, payable at a monthly rate of $149,040 and subject to real estate tax and operating cost escalation. The term was to commence on the date defendant accepted the space for occupancy and was subject to defendant's option to renew for two five-year renewal periods at successively higher rental rates.

whether the lease is terminated, the Lessor and his sureties shall be liable for any damage to the government resulting from his failure to deliver the premises ready for occupancy within the specified time.

For a variety of reasons, including defendant's delay in supplying the necessary floor plans, the parties agreed to delay the occupancy date from February 1 to March 1, 1984. Because of the late delivery of the floor plans and because of its own financial difficulties, C–D accomplished little construction prior to the March 1 deadline. C–D sought to address its financial difficulties by entering into negotiations, ultimately successful, to sell its entire real estate portfolio to Sun Cal.[5] During the course of the negotiations, even though the March 1, 1984, deadline had passed, defendant encouraged C–D and Sun Cal to continue the build-out.[6] On about July 3, 1984, defendant sent revised floor plans to Sun Cal and on July 26, 1984, the contracting officer requested that Sun Cal, as C–D's prospective assignee, submit by August 1, 1984, "a construction schedule including a firm date on which Sun Cal *can commence* build-out construction" (emphasis added). By letter dated August 1, 1984, C–D submitted a construction schedule in the form of a bar chart. The chart depicted construction periods for numerous subtasks with construction commencing on July 16, 1984, and concluding on October 5, 1984.

During August 1984, representatives of the parties met to discuss a possible supplemental lease agreement (SLA) that would increase the amount of space leased and alter both the liquidated damages and the right-to-terminate provisions of the original contract. At an August 17, 1984, meeting, the parties reached agreement as to the terms to be included in the SLA, and plaintiffs subsequently drafted and forwarded to defendant a proposed SLA. In that draft SLA, Sun Cal agreed to use diligent efforts to have the premises ready for occupancy not later than October 15, 1984. If plaintiffs fell behind the critical path schedule, defendant could send a written notice, and if plaintiffs failed to respond adequately to the notice within ten days, defendant could terminate the contract.[7] The proposed SLA also included a waiver of liquidated damages by GSA for delays in delivery prior to October 15, 1984. On September 7, 1984, the contracting officer informed plaintiffs that the government intended to enter the SLA, but that the government could not be bound until the SLA was formally executed.

Though the contracting officer informed plaintiffs in a September 18, 1984, letter that "[t]he [SLA] will be sent to [plaintiffs] shortly," defendant never executed the SLA. However, the contracting officer did send plaintiffs two letters, dated September 20 and 28, 1984, respectively. The September 20 letter indicated that defendant would conduct conformance tests and inspections prior to acceptance of the space.

5. SCI 9 formally assumed C–D's position as owner and lessor of LAX 7 on or about August 30, 1984.

6. On July 19, 1984, in response to a request by C–D, defendant stated in a letter to C–D that "[t]o the extent of our present knowledge, the Lessor has fulfilled all of its duties and is not in default in any manner in the performance of any terms, covenants, or provisions of the lease." The letter also stated that "if any deficiencies which were unknown at the time of this statement are discovered, the Government will enforce its rights according to the lease provisions against all parties."

7. The proposed SLA provided, in pertinent part:
 Lessor *agrees to use diligent efforts* to have the Premises ready for occupancy not later than October 15, 1984, and to progress with the work of improvement in accordance with the Solicitation and with the critical path schedule attached hereto as Exhibit B and made a part hereof. If (a) construction of any item of improvement has not progressed to the point indicated in the critical path schedule by the date specified therein for construction of such item *plus the period of delay, if any, caused by the Government or by an Uncontrollable Event,* and (b) is not completed to such point of progress *within 10 days after the Government has delivered to Lessor written notice* specifying the item or items which are delinquent and the failure to meet the specified date, then the Government shall have the right to terminate the Lease by written notice to Lessor delivered not later than 30 days after the right to terminate arises. (Emphasis added.)

The letter indicated that minor deficiencies could be completed by the contractor as "punch list" items within a reasonable time, and that major deficiencies could result, at the government's discretion, in "non-acceptance of the space and/or a demand [to cure the deficiency]; and/or a negotiated reduction in rental ..." In the September 28 letter, the contracting officer notified plaintiffs that the "government will conduct an acceptance inspection ... on October 4 and 5" and that "[i]f necessary, a follow-up inspection will take place on October 15 and 16."[8]

The October 4, 5, 15, and 16 inspections were conducted as scheduled. Subsequently, by letter dated October 19, 1984, the contracting officer transmitted to plaintiffs a report on the deficiencies found by the October 4 and 5 inspections. In a final decision six days later, on October 25, 1984, the contracting officer notified plaintiffs that the lease was terminated for default for failure "to deliver the space on time and in accord with the contract's terms." The decision further stated, in pertinent part:

> According to the initial contract, the space was to be delivered by March 1, 1984; this date was not met and Sun–Cal subsequently assured that the space would be delivered by October 15.... [The] types of problems [listed above] coupled with Sun–Cal's untimely performance provide little assurance that satisfactory resolution could be achieved at any immediate point. The delivery date having passed and the space being unready for its intended use, [Sun–Cal's] rights to further perform under the contract are hereby terminated....

## VI.

Default terminations are "a species of forfeiture." *DeVito v. United States*, 188 Ct.Cl. 979, 990, 413 F.2d 1147, 1153 (1969). In *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759 (Fed.Cir.1987), the Court of Appeals for the Federal Circuit,

quoting *J.D. Hedin Constr. Co. v. United States*, 187 Ct.Cl. 45, 57, 408 F.2d 424, 431 (1969), characterized default termination as a "drastic sanction" and indicated that it "should be imposed (or sustained) only for good grounds and on solid evidence." *Lisbon*, 828 F.2d at 765. The court also indicated that the burden of proof on the issue of justification for a default termination always rests on the government, even when, as here, the issue arises in a suit brought by the contractor attacking the termination. *Id.*

The contract herein permitted termination for default if the contractor "fails to prosecute the work required to deliver the leased premises ... within the time required by the lease agreement, or any extension of the specified time." In *DeVito*, the court explained that in appropriate circumstances, the government will be deemed to have surrendered its right to so terminate a contract if it fails to terminate within a reasonable time after the specified contract completion date. The court stated:

> Where the Government elects to permit a delinquent contractor to continue performance past a due date, it surrenders its alternative and inconsistent right under the Default clause to terminate, assuming the contractor has not abandoned performance and a reasonable time has expired for a termination notice to be given.

*DeVito*, 188 Ct.Cl. at 990, 413 F.2d at 1153. When such a surrender occurs, the government can establish a new contract completion date which will serve as a basis for default termination in either of two ways. The government can set that date through a bilateral agreement with the contractor, or by unilateral action. *Id.* at 992, 413 F.2d at 1154–55. When the government sets the date unilaterally, it must be specific and the date must be reasonable. The court explained in *DeVito*:

> However, none of defendant's letters to plaintiffs stated that plaintiffs' contract could be terminated for default if the build-out was not completed prior to the October 16 inspection.

---

**8.** Internal governmental correspondence shows that if the inspection was unsatisfactory, defendant was prepared to terminate the lease immediately following the October 16 inspection.

Time is of the essence in any contract containing fixed dates for performance. When a due date has passed and the contract has not been terminated for default within a reasonable time, the inference is created that time is no longer of the essence so long as the constructive election not to terminate continues and the contractor proceeds with performance. The proper way thereafter for time to again become of the essence is for the Government to issue a notice under the Default clause setting a reasonable but specific time for performance on pain of default termination. The election to waive performance remains in force until the time specified in the notice, and thereupon time is reinstated as being of the essence. The notice must set a new time for performance that is both reasonable and specific from the standpoint of the performance capabilities of the contractor at the time the notice is given.

*Id.* at 991–92, 413 F.2d at 1154.

Herein, the last undisputed completion date for the build-out was March 1, 1984. Defendant agrees, as it must, that its post-March 1 negotiations with Sun Cal resulted in a surrender-waiver of its right to terminate the contract based on failure to comply with the March 1, 1984, completion date. The pertinent issue, therefore, becomes whether defendant ever established a new date. Defendant presents alternative arguments in this regard. First, defendant contends that the parties entered a bilateral agreement establishing October 5, 1984, as a new occupancy date, which was then modified bilaterally to October 15, 1984. In the alternative, defendant argues that if the court does not find a bilateral agreement, the court should find that the contracting officer unilaterally set October 15, 1984, as the new completion date.

■ Defendant bases its assertion that the parties reached a bilateral agreement on a new completion date on defendant's

July 26, 1984, request that plaintiffs submit a construction schedule and on plaintiffs' August 1, 1984, reply. Defendant contends that this exchange either constituted a written bilateral agreement or served as a basis for an implied-in-fact bilateral agreement, and thus established October 5, 1984, as the completion date. The characterization of the purported agreement as express or implied in fact ultimately is not significant because the prerequisites for both types of agreements are the same—a mutual intent to reach an agreement, including an unambiguous offer and acceptance. *Russell Corp. v. United States,* 210 Ct.Cl. 596, 609, 537 F.2d 474, 481–82 (1976), *cert. denied,* 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977).

Defendant did not demonstrate the existence of these prerequisites at trial. Defendant's July 26, 1984, letter was not an unambiguous offer seeking to solicit a new completion date. The letter requested, pursuant to paragraph 66 of the contract, that plaintiffs "[s]ubmit a construction schedule including a firm date on which [plaintiffs] can *commence* build-out construction" (emphasis added). The letter did not indicate that the *completion* date plaintiffs proposed in the schedule would be viewed as binding for default purposes. Nor is there anything in paragraph 66, or any other provision in the lease that indicates that a construction schedule submitted by plaintiffs would necessarily have such binding effect.[9]

Similarly, there never was any unambiguous acceptance by plaintiffs of a new completion date. Plaintiffs' witnesses testified that they intended the October 5, 1984, date to serve simply as a target date and not as a binding default date. There is nothing in either the construction schedule or the accompanying letter indicating to the contrary. Defendant takes bits and pieces from various correspondence and concludes that plaintiffs viewed October 5, 1984, as a binding date. But that evidence is at least as readily interpreted as indicat-

9. Paragraph 67(B) provides that failure to furnish a construction schedule within 15 days of the contracting officer's request "shall be basis for termination of the contract for default."

But it does not provide that failure to meet the time periods set forth in the construction schedule constitutes grounds for default.

ing that plaintiffs viewed October 5, 1984, as a target date. Both the negotiations leading up to the draft SLA and the wording of the SLA are generally consistent with neither party believing it had previously entered a binding commitment setting October 5, 1984, as a default date. Moreover, in view of the significant financial losses that would result from a default judgment, it is reasonable to assume that had plaintiffs viewed October 5, or October 15, as a default date, they would have attempted to negotiate an extension.

Defendant's argument that the parties subsequently agreed to an October 15, 1984, default date, in essence, is based on the contention that the parties agreed to extend the previously agreed to October 5, 1984, date. The court's conclusion that no agreement as to October 5 ever existed would seem to undermine any finding that the parties entered into an agreement to extend the default date to October 15, 1984. In any event, defendant's contention as to the October 15 date suffers the same deficiencies as its allegations as to the October 5 date. The various correspondence, including defendant's letters of September 7, 20, and 28, 1984, and the related testimony, do not demonstrate the required unambiguous offer and acceptance and mutual intent to agree to a new default date.

The ambiguity in defendant's statements to plaintiffs concerning the significance of the October 5 and 15, 1984, dates is similarly fatal to defendant's alternative contention that plaintiffs established a default date unilaterally. As explained above, default is a "drastic sanction," and if the government seeks unilaterally to establish a new default date, it must be specific in its pronouncement, i.e., it must set a "specific time for performance on pain of default termination." DeVito, 188 Ct.Cl. at 991–92, 413 F.2d at 1154. The various correspondence from the contracting officer indicate that the government would not accept the premises until the build-out was adequately completed. But none clearly advises plaintiffs that a new default date was being established and that plaintiffs' contract would, or could be, terminated for default if the work was not completed by October 5 or 15, 1984.

*Conclusion*

In sum, defendant apparently showed considerable patience when C–D ran into financial difficulties. It apparently could have terminated the contract for failure to meet the March 1, 1984, completion date but it chose instead to give plaintiffs additional time to complete the project. But defendant's good intentions in surrendering its right to terminate on March 1, 1984, had the legal effect of creating new obligations. that the government had to satisfy before it again had the authority to terminate the contract for default based on the contractor's delay in completing the project. Those legal obligations were not satisfied herein and defendant therefore lacked the authority under the contract to terminate for default when plaintiffs failed to complete the build-out by October 15, 1984.

For the reasons set forth above, defendant's motion to dismiss must be denied. On or before August 9, 1990, the parties shall file a status report, jointly or separately, proposing scheduling for further proceedings in this action.

IT IS SO ORDERED.