**SUN CAL, INC., et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 558–85C.

United States Claims Court.

March 6, 1992.

Alvin S. Kaufer, Los Angeles, Cal., for plaintiffs. John Ossiff, of counsel.

George M. Beasley, III, with whom were Asst. Atty. Gen. Stuart M. Gerson and David M. Cohen, Director, Washington, D.C., for defendant, Roland Ben, General Services Admin., of counsel.

## OPINION

ANDEWELT, Judge.

This government contract action involves a lease and construction contract covering the sixth, seventh, and eighth floors of an office building located in Los Angeles, California. The United States General Service Administration (GSA) terminated the contract for default and never took possession of the property. In a previous decision, this court concluded that the termination for default was improper. *Sun Cal, Inc. v. United States*, 21 Cl.Ct. 31 (1990). That decision leaves the government potentially liable for damages. In respective motions, the parties seek resolution of an issue of law affecting the measure of damages herein.[1] The issue involves the calculation of damages in a situation where the lessee repudiates the lease contract and thereafter, the lessor, prior to expiration of the lease, transfers the leased property to another entity who in turn modifies the property and leases a portion of the property to a third party.

## I.

The government originally entered the instant lease and construction contract with C–D Investment Co. (C–D). In August 1984, C–D transferred title to the office building to plaintiff Sun Cal Investments No. 9, Ltd. (SCI 9), a limited partnership in which plaintiff Sun Cal, Inc. (Sun Cal), was the sole general partner. The government acquiesced in the transfer of the lease to SCI 9 but subsequently terminated the contract for default. *Id.* at 32, 36. In response to this termination, on March 1, 1985, plaintiffs submitted a certified claim to the contracting officer seeking as damages, *inter alia*, rents due up through expiration of the lease less any amount that was obtained by reletting the premises.

In late March 1985, SCI 9 transferred title to the office building to Sun Cal[2] but the transfer did not include the pending certified claim. In May 1985, the contracting officer issued a final decision denying that claim. The contracting officer took the position that GSA's termination of the contract for default was warranted and, hence, the government was not liable for any funds. On September 25, 1985, plaintiffs filed the instant action.

1. Plaintiffs raise the issue in a motion to exclude evidence and defendant raises the issue in a cross-motion *in limine* and in a motion for leave to amend its answer.

2. At oral argument, plaintiffs contended that in view of the similarity in ownership and structure of SCI 9 and Sun Cal, this transfer should be viewed essentially as a corporate reorganization and not as a transfer of ownership to a third party. But the pertinent evidence as to the structure and ownership of these two entities is not presently before the court. For purposes of this decision, the court will assume that a transfer of ownership to a third party occurred.

Between March 1985 and January 1986, Sun Cal apparently made some modifications to portions of the building that had been the subject of the lease to GSA. In December 1985, Sun Cal leased a portion of the building to Northrop Aircraft Company. In March 1986, title to the office building again was transferred, from Sun Cal to Century Centre Partners, Ltd., a newly created limited partnership of which Sun Cal was the general partner.[3]

The issue presently before the court is the significance, when calculating damages, of the post-termination for default transfers of title to the office building, physical modifications of the leased premises, and the relet to Northrop Aircraft. Plaintiffs contend that damages herein should be calculated using the same general standards as would apply to any breach of contract that did not involve real property. Plaintiffs argue that the government's refusal to take possession of the property and its termination of the contract for default constitute an anticipatory breach of contract and that plaintiffs are entitled to receive the economic damages resulting from that breach. The damages would include, plaintiffs argue, the value of rent payments due through expiration of the lease less any amounts properly considered in mitigation of damages. Under plaintiffs' approach, as explained below, the transfers of title, modifications, and relet are relevant only to the extent they in some way affect the issue of mitigation of damages.

Defendant disagrees and contends that because real property is involved, the analysis traditionally employed for measuring breach of contract damages should not apply. Defendant argues that under applicable real property principles, a lessor's transfer, modification, or relet of the real property would constitute an acceptance of the lessee's offer to surrender the leasehold and, therefore, any one of these actions is sufficient to end the lessor's right to any damages based on rents due under the lease after such action. Hence, under defendant's approach, upon SCI 9's transfer to Sun Cal in March 1985, plaintiffs lost any right to damages based on rents due under the lease for the time period after the transfer.

■■■ As described below, there is a split of authority on this legal issue—there is support in state law for both defendant's and plaintiffs' approaches. California, the state in which the instant office building is located, has adopted a statute that generally mandates the breach of contract measure of damages. Cal.Civ.Code § 1951.2 (Deering 1991). But, in any event, California law does not control here. Federal government contracts generally are governed by federal law rather than by the law of the particular states in which the contracts are executed or performed. With exceptions not pertinent here, this general rule applies to contracts for the lease of real property. *Keydata Corp. v. United States*, 205 Ct.Cl. 467, 482, 504 F.2d 1115, 1123–24 (1974).[4]

Hence, this court must decide the instant dispute based on applicable federal law. But neither party has cited any binding federal precedent that directly addresses the precise damage calculation issue raised here. Faced with a similar situation in *Keydata*, the Court of Claims described the task before it as follows: "In such an area of free choice, we 'should take account of the best in modern decision and discussion.'" *Id.* at 480, 504 F.2d at 1122, *quoting Padbloc Co. v. United States*, 161 Ct. Cl. 369, 377 (1963).

---

3. Plaintiffs contend that this transfer also was merely a corporate reorganization. *See* note 2, *supra.* But again, the pertinent evidence to evaluate this claim is not presently before the court.

4. In *Keydata,* the court explained:

Leases are not sufficiently different from other federal procurement contracts to call for a different policy across-the-board in the construction of their terms. At least in this case in which there is no question as to the content of the property interest transferred, but merely a delineation of one of the landlord's collateral obligations, there is no adequate reason to subordinate federal to state law.

205 Ct.Cl. at 482, 504 F.2d at 1123.

## II.

To understand the difference in the parties' respective approaches, it is necessary to place the lease contract in a historical context. Defendant's property-based approach to lease contracts has its roots in the early common law. Early common law, in effect, recognized a distinction between leases of real property and other contracts. Under early common law, a lease was characterized as a conveyance of an estate in real property and the landlord and tenant were viewed as being in privity of estate rather than merely in privity of contract. *See Schneiker v. Gordon,* 732 P.2d 603, 606–607 (Colo.1987); John F. Hicks, *The Contractual Nature of Real Property Leases,* 24 Baylor L.Rev. 443, 450 (1972); Sarajane Love, *Landlord's Remedies When the Tenant Abandons: Property, Contract, and Leases,* 30 Kan.L.Rev. 533, 534–35 (1982) (hereinafter *Love*); 2 Richard R. Powell, *The Law of Real Property* ¶ 221[1] (1991) (hereinafter *Powell*). This common law focus on estate and property concepts rather than on the contractual nature of the lease led to a series of pertinent legal rules.

First, in the event a lessee abandoned a property and failed to make rent payments, the lessor generally could sue only to recover rents that were past due. The lessor generally could not bring suit based on an anticipatory breach theory to secure the total damages that would result from the breach throughout the term of the contract. *Schneiker,* 732 P.2d at 607 ("Before courts began to recognize that contractual principles are relevant to the determination of a landlord's rights on abandonment by a tenant, a landlord could not rely on the contract doctrine of anticipatory repudiation to recover installments of rent that would have accrued but for the abandonment and surrender"); *Love* at 557–63.[5] The medieval lessor had to look to the land for payment and the payment could not be

recovered from the land until the payment was actually due. *See id.; William Filene's Sons Co. v. Weed,* 245 U.S. 597, 601, 38 S.Ct. 211, 213, 62 L.Ed. 497 (1918) ("Rent issues from the land, is not due until the rent day, and is due in respect of the enjoyment of the premises let.") Therefore, when a lessee abandoned the land, the lessor could sue periodically to recover rent past due or wait until the end of the lease and sue for all of the back rent.

Second, based in part on the focus on the property interest rather than on contract rights, the early common law did not place any duty on the lessor to mitigate damages after a breach by the lessee. *See Schneiker,* 732 P.2d at 607; *Powell* at ¶ 249[1]. So long as the estate existed, the lessee's obligation to pay the rent continued. Hence, the lessor could refuse alternative offers to lease the property and continue to seek the full rent due from the lessee.

Third, early common law did provide a method for terminating the lease estate and terminating the lessee's obligation to pay future rent. That method was called surrender of the estate. Surrender involved, at its essence, a mutual agreement between the parties pursuant to which the estate was returned to the lessor. Lord Coke defined surrender as "a yielding up of an estate for life or years to him that hath an immediate estate in reversion or remainder, wherein the estate for life or years may drown by mutuall agreement between them." Sir Humphrey Davenport, *An Abridgement of The Lord Coke's Commentary on Littleton* 369 (Garland Publishing, Inc. 1979) (1651) (hereinafter *Coke*).

Under early common law, the abandonment of a leased property was considered an offer by the lessee to the landlord to surrender the leased property. *See, e.g., Pelton v. Place,* 71 Vt. 430, 46 A. 63 (1899); *Love,* at 535. The landlord had the choice

5. The doctrine of anticipatory breach is explained in 4 Arthur L. Corbin, *Corbin on Contracts* § 959 (1951), as follows:
    [A] definite and unconditional repudiation of the contract by a party thereto, communicated to the other, is a breach of contract, creating an immediate right of action and other legal effects, even though it takes place long before the time prescribed for the promised performance and before conditions specified in the promise have ever occurred.

to accept or refuse the offer. If the landlord refused the offer, the lessee's obligation to pay rent would remain through the end of the lease.[6] If the lessor chose instead to accept the offer, the tenant's obligation to pay rent for the remainder of the term would end. *Love* at 535. Thus, in effect, under early common law a covenant to pay rent was not viewed as a contractual obligation independent of the estate, but rather as a promise running with the estate. When the estate was returned to the lessor, the obligation to pay rent necessarily returned with it.[7]

In the instant action, there was no express agreement that the transfer of the property or the other disputed actions would constitute a surrender of the lease estate and terminate defendant's obligation to make future rent payments. To the contrary, in its claim to the contracting officer, SCI 9 unequivocally indicated that it was seeking damages based on defendant's failure to pay rents throughout the lease term. But under common law, an express agreement was not required to produce a surrender. In addition to surrenders based on express agreements, Lord

Coke said that there also could be "surrenders in law." *Coke* at 369. Courts have found such surrenders in a variety of situations where, after the lessee abandoned the lease estate, the lessor took actions that were fundamentally inconsistent with the existence of the estate in the lease. Such actions included certain relets or sales of the leased property. *See, e.g., Pelton v. Place,* 71 Vt. 430, 46 A. 63 (1899) (relet); *Bernard v. Renard,* 175 Cal. 230, 165 P. 694 (1917) (sale).

Two theories have been offered to support the conclusion that such actions should create a "surrender by operation of law." *Love* at 545; 4 Herbert T. Tiffany, *The Law of Real Property* § 962 (3rd ed. 1975). Under one theory, the underlying acts involve an implied acceptance by the lessor of the offer of surrender by the lessee.[8] The other theory involves estoppel—because the lessor took actions inconsistent with the continued existence of the lease estate, the lessor was estopped from denying that a surrender had occurred.[9]

Defendant's theory of damages herein rests on this early common law approach

---

6. Under certain circumstances, a lessor who refused an offer of surrender could resume possession of the property for the limited purpose of reletting the property to a new tenant. *See, e.g., Slayton v. Jordan,* 42 App.D.C. 421 (1914); *Higgins v. Street,* 19 Okl. 45, 92 P. 153 (1907); *Underhill v. Collins,* 132 N.Y. 269, 30 N.E. 576 (1892). But such reletting was not for the benefit of the lessor but rather for the estate holder—the original lessee. Thus, any rent received from the new lessee was for the benefit of and had to be applied to the original lessee's account. If the rent received from the new tenant was less than the rent charged to the original tenant-estate holder, the lessor could sue the original tenant for the difference. *Love* at 535.

7. [T]he medieval landlord had to look to the land for the rent, and if the tenant no longer owned his interest in the land because of a surrender, the tenant had no further obligation to pay rent. So strong was the association between the land and the landlord's right to rent that, even after landlords began routinely to extract from their tenants an express covenant to pay rent to shore up the rental obligation that was inherent in the conveyance of the term, a surrender terminated any liability based on the covenant just as surely as it terminated the liability based on privity of estate between landlord and tenant.
*Love* at 535–36 (footnotes omitted).

8. The Supreme Court in *Beall v. White,* 94 U.S. 382, 389, 24 L.Ed. 173 (1877), described a surrender as follows:

[T]he yielding up the estate to the landlord, so that the leasehold interest becomes extinct by mutual agreement between the parties. It is either in express words, by which the lessee manifests his intention of yielding up his interest in the premises, or by operation of law, when the parties without express surrender do some act which implies that they have both agreed to consider the surrender as made.
*See also* 49 Am.Jur.2d *Landlord and Tenant* § 1094 (1970).

9. The theory of estoppel is traceable to Baron Parke's dictum in *Lyon v. Reed,* 153 Eng.Rep. 118, 127 (1844):

[A]ll the old cases will be found to depend on ... an act done by or to the owner of a particular estate, the validity of which he is estopped from disputing, and which could not have been done if the particular estate continued to exist. The law there says, that the act itself amounts to a surrender. In such case ... there can be no question of intention.... It takes place independently....
*Love* at 545 n. 65.

and the modern cases that have applied it. *See, e.g., First Wisconsin Trust Co. v. Wiemann Co.,* 93 Wis.2d 258, 286 N.W.2d 360 (1980); *International Tool & Engineering Co. v. Sullivan,* 389 So.2d 138 (Ala.Civ.App.1980). Defendant contends that the transfer of the instant building to Sun Cal, the subsequent transfer to Century Centre Partners, Ltd., the modifications of the leased premises by Sun Cal, and the relet to Northrop Aircraft, each was sufficient to result in a surrender by operation of law. Therefore, defendant argues, its obligation to pay rents ended upon the earliest of these events—the transfer to Sun Cal—and rents due under the contract after that date cannot properly be considered when calculating damages.

### III.

There has been significant criticism by some modern courts and treatises of the pure common law approach which interprets a lease essentially as the grant of an estate in real property and does not focus on the lease's contractual characteristics. *See, Schneiker,* 732 P.2d at 604; 1 *American Law of Property* § 3.11 (A. James Casner ed., 1952). Modern courts frequently have concluded that applying the common law approach produces unacceptable results, not only from the perspective of the parties to the dispute, but also from the broader perspective of the general public. *See, e.g., Wright v. Baumann,* 239 Or. 410, 398 P.2d 119 (1965); *Martin v. Siegley,* 123 Wash. 683, 212 P. 1057 (1923). As a result, instead of relying exclusively on common law property principles, modern courts have tended more and more to rely upon contract principles when evaluating lease disputes. *See Sommer v. Kridel,* 74 N.J. 446, 378 A.2d 767 (1977); *Javins v. First Nat'l Realty Corp.,* 428 F.2d 1071 (D.C.Cir.), *cert. denied,* 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970); *Bernstein v. Seglin,* 184 Neb. 673, 171 N.W.2d 247 (1969); *Wright v. Baumann,* 239 Or. 410, 398 P.2d 119 (1965); *see also* 5 Arthur L. Corbin, *Corbin on Contracts* § 1039A (Pocket Part 1991) ("In modern times, the courts increasingly recognize that a lease is often more appropriately treated as a contract rather than a conveyance of real estate.")

For example, certain courts have rejected the early common law rule that lessors faced with an abandonment of their leased property can only seek damages with respect to past-due rents. Instead, these courts have applied the general contract principle of anticipatory breach and have permitted lessors to respond to a lessee's abandonment of property by bringing suit for total damages that would result from the breach, including damages relating to rents due after the date of suit up through expiration of the lease term. *See, e.g., Schneiker,* 732 P.2d 603; *United States Rubber Co. v. White Tire Co.,* 231 S.C. 84, 97 S.E.2d 403 (1956); *Galvin v. Lovell,* 257 Wis. 82, 42 N.W.2d 456 (1950). By permitting the recovery of damages for rents due subsequent to the date of suit, these courts, in effect, have recognized the covenant to pay rent as a distinct covenant which can be the basis of a damage claim even if the lessee's right to possession of the property has expired. In effect, though privity of estate no longer exists between the parties, privity of contract remains. *Schneiker,* 732 P.2d at 608.

In *Hawkinson v. Johnston,* 122 F.2d 724, 729 (8th Cir.1941), the Court of Appeals for the Eighth Circuit, applying Missouri law, concluded that it made sense "as a matter of sound practicality" to apply the doctrine of total breach by anticipatory repudiation to lease contracts. The court explained: "The man who wrongfully renounces a contract into which he has deliberately entered cannot justly complain if he is immediately sued for a compensation in damages by the man whom he has injured...." *Id., quoting Hochster v. De La Tour,* 22 L.J.Q.B. 455, 2 El. & Bl. 678 (1853). The court then, in a particularly perceptive analysis, explained the general benefits that flow to both the parties to the contract and society in general from the application of the principle of anticipatory breach to property leases. The court stated:

> The real sanctity of any contract rests only in the mutual willingness of the parties to perform. Where this willing-

ness ceases to exist, any attempt to prolong or preserve the status between them will usually be unsatisfactory and mechanical. Generally speaking, it is far better in such a situation, for the individuals and for society, that the rights and obligations between them should be promptly and definitely settled, if the injured party so desires, unless there is some provision in the contract that, as a matter of mutual intention, can be said to prevent this from being done. The commercial world has long since learned the desirability of fixing its liabilities and losses.as quickly as possible, and the law similarly needs to remind itself that, to be useful, it too must seek to be practical.

*Hawkinson,* 122 F.2d at 729–30.

Next, many courts also have rejected the common law notion that the lessor has no obligation to take reasonable steps to mitigate damages in response to a lessee's abandonment of the leased property. These courts instead have applied to lease contracts the same duty to mitigate that generally applies to all other contracts.[10] *See Sommer v. Kridel,* 74 N.J. 446, 378 A.2d 767 (1977); *Wright v. Baumann,* 239 Or. 410, 398 P.2d 119 (1965). In *Schneiker,* the Supreme Court of Colorado explained the strong public policy behind requiring such mitigation, as follows:

> Public policy also favors the application of contract principles to these circumstances. Under traditional property law principles a landlord could allow the property to remain unoccupied while still holding the abandoning tenant liable for rent. This encourages both economic and physical waste. In no other context of which we are aware is an injured party permitted to sit by idly and suffer avoidable economic loss and thereafter to visit the full adverse economic consequences upon the party whose breach initiated the chain of events causing the

loss. Furthermore, it is generally in the interests of society that property be put to practical use so far as is economically feasible. Usually, no economic value is obtained from property if a landlord allows it to remain idle. At the same time, the possibility of physical damage to the property through accident or vandalism is increased. The rules for awarding damages in the context of abandonment and breach by the tenant should discourage, rather than encourage, economic and physical waste.

*Schneiker,* 732 P.2d at 610.

Next, when addressing the common law doctrine of surrender by operation of law, some courts have similarly rejected the early common law approach and applied instead contract principles. *See, e.g., McGuire v. City of Jersey City,* 125 N.J. 310, 593 A.2d 309 (1991); *United States Rubber Co. v. White Tire Co.,* 231 S.C. 84, 97 S.E.2d 403 (1956). As explained above, common law courts have sometimes found a surrender by operation of law in certain situations where a lessor responds to the lessee's abandonment of the property, for example, by reletting or selling the property to a third party. The courts concluded that such a relet or sale was inconsistent with the original lessee's estate in the property and, therefore, based on an implied agreement or estoppel theory, constituted a binding recognition by the lessor that the estate no longer existed. The recognition of the end of the estate was crucial because under early common law, with the end of the estate necessarily came the end of the lessee's obligation with respect to future rents under the lease. *See* note 7, *supra.*

But this early common law approach to surrenders by operation of law is not consistent with the modern decisions that permit anticipatory breach suits for lease contracts and oblige the lessor to mitigate damages. First, in an anticipatory breach suit, a lessor can recover his or her total

---

**10.** The *Restatement (Second) of Contracts* § 350 (1981) expresses the duty to mitigate as follows:
(1) Except as stated in Subsection (2), damages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation.

(2) The injured party is not precluded from recovery by the rule stated in Subsection (1) to the extent that he has made reasonable but unsuccessful efforts to avoid loss.

damages resulting from the breach up through expiration of the lease term. Hence, application of anticipatory breach to lease cases severs the common law tie between the end of the estate and the end of the lessee's obligations relating to future rents. In effect, though privity of estate may end with an abandonment by the lessee, privity of contract does not. *Schneiker*, 732 P.2d at 611. Since an end of the estate no longer necessarily represents the end of the lessee's obligation with respect to future rents, it is no longer possible to interpret an act inconsistent with the continued existence of the estate as necessarily also indicating the lessor's intent to surrender its right to damages relating to future rents. There simply is no longer any basis for finding an implied agreement of surrender or for subjecting the lessor to estoppel.

Second, the common law courts' application of surrender by operation of law is similarly in conflict with an obligation on the lessor to mitigate damages. Reletting and selling property are two of the most direct ways for a lessor to mitigate damages. Hence, whatever may be the proper inference to draw from a relet or a sale in the absence of a duty to mitigate, if a duty to mitigate exists, it clearly cannot be presumed that the lessor's relet or sale of the leased property demonstrates an intent to accept a surrender. It is at least as likely to be merely an attempt to mitigate damages. *See* 49 Am.Jur.2d *Landlord and Tenant* § 625 (1970) ("Consent to a surrender terminating liability for rent should not be implied from the mere fact of a reletting in a jurisdiction which follows the view that the landlord is bound to reduce damages resulting from wrongful abandonment by the tenant by reletting the premises if possible ..." (footnotes omitted).)

Given this tension between surrender by operation of law and the concepts of anticipatory breach and mitigation, it is not surprising that some modern courts have concluded that the relet or sale of leased property should properly be viewed simply as an act in mitigation of damages and not as the final necessary act to achieve a surrender by operation of law. *See, e.g., McGuire v. City of Jersey City*, 125 N.J. 310, 593 A.2d 309 (1991). Under this approach, the relet or sale of a property after repudiation of the lease contract would generally involve mitigation and would not function necessarily to end the lessor's entitlement to seek damages with respect to rents due thereafter under the lease.[11]

Plaintiffs' theory of damages herein adopts the approach of these modern courts and relies upon contract rather than early common law principles to assess damages for breach of the instant lease. Plaintiffs contend that defendant's termination for default constituted an absolute repudiation, and hence an anticipatory breach, of the instant lease and construction contract. *See* note 5, *supra*. Plaintiffs then argue that the proper measure of damages for such a breach is the amount it takes to place the landlord in the position he would have occupied had the breach not occurred, taking into account the landlord's duty to mitigate. *Schneiker*, 732 P.2d at 612. According to plaintiffs, their transfer of the leased property subsequent to the anticipatory breach should be considered, if at all, on the issue of mitigation of damages.

### IV.

The parties dispute which of the two approaches to lease contracts—the early common law or the modern contractual approach—currently is favored by a majority of the state jurisdictions. But resolution of this dispute is not critical because this is not an instance where majority rules. As explained above, in defining the appropriate federal law herein, this court must "take account of the best in modern decision and discussion." *Keydata*, 205 Ct.Cl. at 480, 504 F.2d at 1122, *quoting Padbloc*

---

11. In *McGuire*, the court stated:

> [I]n recent years, New Jersey and other jurisdictions have shown an increasing tendency to analogize landlord-tenant law to conventional doctrines of contract law. In view of that tendency, we think it is more appropriate to consider the landlord's sale of the premises as a mitigation, rather than as an acceptance of surrender.

593 A.2d at 315 (citations omitted).

*Co. v. United States*, 161 Ct.Cl. 369, 377 (1963). Therefore, it is the quality rather than the quantity of the decisions that typically should control.[12]

In determining which approach is "best," the court appreciates that many of the principles of common law apply as equally well today as when they were first developed, and, in addition, that there are important societal interests furthered by maintaining, and indeed cherishing, our common law principles. The court also appreciates that there may be certain aspects of real property leases that, for convincing reasons, are not as appropriately handled under contract principles as they are under the common law approach. But with respect to the precise issue presented herein, it seems readily apparent that the best and most appropriate approach is not the approach derived from early common law, but rather the approach formulated in the modern decisions applying contract principles to lease contracts.

First, it makes eminent sense, unless the contract demonstrates a contrary intent, for the doctrine of anticipatory breach to apply to lease contracts to the same extent that it applies to other contracts. In applying anticipatory breach to Missouri leases in 1941, the *Hawkinson* court explained: "The commercial world has long since learned the desirability of fixing its liabilities and losses as quickly as possible...." 122 F.2d at 729. Since 1941, modern commerce has, if anything, become even more complex and the need for quick resolution of disputes has become even more acute. There simply is no compelling reason for treating lease contracts under a different breach standard than would apply to contracts covering other types of property.

▮ Second, it is similarly appropriate in lease cases, unless the contract demonstrates a contrary intent, to oblige lessors to take reasonable steps to mitigate damages resulting from the repudiation of a lease contract. In measuring the economic damage to a lessor resulting from a repudiation of a lease by the lessee, it simply does not seem reasonable to conclude that the lessor will suffer economic damage equal to the rent payments due through the end of the lease period when the lessor, by taking reasonable steps, can readily secure an acceptable new tenant willing to rent the subject property. An assessment of economic damage reasonably should consider such mitigation alternatives readily available to the lessor. In addition, this nation has limited economic resources. A legal approach that encourages leaving valuable property vacant serves only to foster a waste of those scarce resources. Again, there is no compelling reason for applying a different standard to lease contracts than would apply for all other contracts.

Third, for the reasons explained above, a natural and appropriate corollary to the application of anticipatory breach and mitigation of damage principles to lease contracts is to modify the common law doctrine to the extent that it found a surrender by operation of law when a lessor relet, transferred, sold, or modified the leased property after an anticipatory breach by the lessee. For the reasons explained above, where anticipatory breach and mitigation apply, there is no sound basis on which to imply that these post-breach actions by the lessor necessarily amount to an agreement to accept a surrender or an acknowledgement by the lessor that it no longer can seek full damages for the breach. To the contrary, these post-breach actions typically will constitute merely an attempt to mitigate damages, and that attempt is totally consistent with an intent to seek full damages.

▮ One final point must be stressed. The parties to a lease agreement have the ability to define in their contract their respective rights. For example, the parties could make clear that the lessor has no obligation to mitigate damages in the event

---

12. Of course, the court recognizes that predictability is very important in the law. Predictability can be lost if federal law departs drastically from the law applicable in the various states. Therefore, in determining the applicable federal law, the court should consider carefully the pertinent law of the states.

of an abandonment, or that the lessor's transfer of the property after such an abandonment will end any right to damages based on rents due thereafter. But the problem here is that the parties did not specify how the instant situation should be handled. Thus, the court is faced with the task of determining what rules apply in the absence of any clear indication of the parties' intent in the contract.

For the reasons set forth above, the court concludes that it is appropriate to resolve the instant dispute by interpreting the lease contract according to general modern contract principles. Under such an approach, absent more, the transfer, relet, sale, or modification of the leased property after a definite and unequivocal repudiation of the contract by the lessee would not end the lessor's right to sue for total damages resulting from the breach. In the absence of any indication in the contract that the parties intended these actions by the lessor to preclude such a suit, it is not appropriate to mandate that result "by operation of law."

### Conclusion

For the reasons set forth above, plaintiffs' transfers, modifications, and relet of the leased property do not constitute a surrender by operation of law. These actions are relevant, if at all, to the issue of mitigation of damages.

IT IS SO ORDERED.