593 A.2d 309

HUGH A. McGUIRE, T/A McGUIRE ASSOCIATES, PLAINTIFF–RESPONDENT AND CROSS–APPELLANT, v. CITY OF JERSEY CITY, DEFENDANT–APPELLANT AND CROSS–RESPONDENT.

Argued February 11, 1991—Decided July 30, 1991.

*Paul W. Mackey,* Assistant Corporation Counsel, argued the cause for appellant and cross-respondent (*Joseph Healy,* Corporation Counsel, attorney; *Thomas Fodice,* First Assistant Corporation Counsel, and *Carol Zylbert,* on the briefs).

*Robert E. Margulies* argued the cause for respondent and cross-appellant (*Margulies, Wind, Herrington & Katz*, attorneys; *Robert E. Margulies* and *Jack Jay Wind*, on the briefs).

The opinion of the Court was delivered by

HANDLER, J.

This is a property owner's action for breach of a lease by the lessee, a municipality. The lease provided for a twenty-year term of occupancy in two adjoining buildings. The lessor was to renovate the buildings for use by the municipality's housing court and law department. Before completion of the renovations or commencement of occupancy, the municipality notified the lessor that it would discontinue the lease at the end of the year. The municipality claimed that the ordinance approving the lease conditioned the payment of rentals on annual appropriations, and impliedly authorized the municipality to cancel the lease at the end of each year. The lessor then brought this action, contending that the municipality had breached the twenty-year lease. The questions before this Court involve the municipality's liability for breach given the terms of the lease and enabling ordinance, the proper elements of damages if the municipality is indeed liable, and the propriety of awarding attorneys' fees to plaintiff.

I

In 1982, plaintiff, Hugh A. McGuire, purchased adjoining buildings at 298–300 Baldwin Avenue and 554–556 Newark Avenue, Jersey City (the City), for a total of $92,000. In early 1985, McGuire began discussions with the City about renovating the premises for the City's housing court, law department, and related agencies. McGuire and representatives of the City negotiated a lease for a twenty-year term, to begin September 1, 1985 and to expire on August 31, 2005. The lease provided for a yearly rental of $288,300, payable in monthly installments of $24,025 (excluding cost-of-living increases not at issue here).

Further, the lease called for McGuire to pay $40,498 in yearly operating expenses; the City would be responsible for operating expenses beyond that amount. The City was granted an option to purchase the properties for $2,400,000 during the tenth year of the lease. At trial, McGuire testified that certain provisions of the lease had been drafted to ensure that he could receive federal investment tax credits for renovations to the buildings; however, the lease does not mention any such tax considerations.

McGuire signed the lease, which was subject to and contingent on City Council approval. Subsequently, on March 28, 1985, the City Council passed an ordinance to permit the City to enter into the lease. The ordinance contained the following relevant provisions:

1. The Mayor or Business Administrator is authorized to execute the attached lease agreement in substantially the form attached, subject to such minor modifications as the Corporation Counsel of Jersey City shall deem necessary and advisable;

2. This lease shall endure for a period of twenty (20) years, commencing on or about September 1, 1985 and terminating on or about August 31, 2005. The continuation of this lease beyond each fiscal year during the term shall be subject to the availability and appropriation of funds in the temporary and permanent budgets for the subsequent fiscal year.

McGuire did not receive a copy of the ordinance. The City's business administrator signed the lease shortly after passage of the ordinance. The copy signed by the business administrator was apparently in the same form as had been signed by McGuire, without any of the "minor modifications" referred to in the ordinance.

McGuire continued with the plans for renovations, working with City officials to determine the lessee's required specifications. The City's planning board approved a site plan for the project on May 8, 1985. McGuire undertook demolition work, commissioned architectural plans, and applied for a $1.1 million mortgage to fund the renovations.

Following elections in the late spring of 1985, control of the City's government changed hands. In August 1985, the new

City Council reviewed the McGuire lease, determined that the cost of the lease was excessive in view of the City's fiscal problems, and, relying on the future appropriations provision of the enabling ordinance, determined that the City would not appropriate monies to pay for the lease after December 1985. On September 5, 1985, the City's corporation counsel notified McGuire of the cancellation and recommended that McGuire discontinue renovations. It is apparent from the sequence of events that the buildings were not ready for occupancy by September 1, 1985; in fact, McGuire had never closed on the $1.1 million mortgage for the renovations. In December 1985, McGuire brought this action against the City for breach of the lease. Sometime in 1987, during the course of proceedings before the trial court, McGuire sold the properties for approximately $750,000.

On July 2, 1987, the trial court granted partial summary judgment for McGuire on the issue of the City's liability. The issue of damages was tried in September 1987, and the trial court found McGuire entitled to damages of $1,063,463.12. On liability, the trial court determined that a municipality has the legal power to enter into a long-term lease. Although the City had argued that irregularities in the execution of the lease rendered it invalid, the court held that the subsequent conduct of the City's representatives in encouraging renovations either ratified the City's acceptance of the lease, or estopped the City from asserting the lease's invalidity. After the damages trial, the court based its award on assertions of defendant's expert that the lease was a "tax free deal". Nonetheless, the court specifically refused to award damages for McGuire's lost investment tax credits. The court also declined to permit a "gross up" of the damages award, *i.e.*, an increased amount that would net the judgment amount *after* taxes, to eliminate the effects of the taxable status of the judgment itself. Finally, the trial court denied McGuire's claim for counsel fees.

The Appellate Division, in an unreported decision, affirmed the finding of liability on different grounds, reasoning that the

language of the ordinance did not materially alter the provisions of the lease. However, the Appellate Division remanded for reconsideration of damages, concluding that McGuire had an obligation to mitigate his damages under case law and under the terms of the lease itself, which provided:

Lessee shall ... pay Lessor as liquidated damages for its default hereunder any deficiency between the rent hereby reserved and the net amount, if any, of the rents collected [from reletting the property for the balance of the lease term].... [T]he Lessor shall take all reasonable steps to relet the leased premises in order to mitigate the damages or loss which may be charged to the Lessee.

While holding that the lease thus obligated McGuire to mitigate damages regardless of any common-law duty, the Appellate Division noted that it, like the trial court, accepted McGuire's argument that the liquidated damages clause should not apply because McGuire's loss was readily ascertainable. While the continuing disputes over McGuire's damages presented on appeal may belie that his loss is so readily ascertainable, the effect of the liquidated damages clause has not been raised by the parties before this Court. Moreover, the lease's provision for liquidated damages is no more than a restatement of the usual measure of damages for breach of a lease, and even were the provision otherwise applicable, it does not seem to serve the proper objective of a liquidated damages clause, *i.e.*, to set damages at a specific amount in order to avoid complex factual presentations in an action for breach.

In addition, the Appellate Division suggested that McGuire's sale of the buildings in 1987 should limit his recovery for breach. On the issue of taxes, the Appellate Division construed McGuire's arguments on appeal as a request for a "gross up" to offset the taxability of the award, and denied the claim. Finally, the Appellate Division reversed the trial court's denial of attorneys' fees, finding a default provision in the lease to be a sufficient basis for granting fees, but cautioning that a contingent fee would be impermissible and that any fee award should be strictly limited to the reasonable value of counsel's services. One member of the Appellate Division panel, in a

partial dissent, would have permitted McGuire to recover damages for loss of the investment tax credits that McGuire had claimed the transaction would have generated.

McGuire brought an appeal as of right on the issue of taxes, based on the partial dissent below. *R.* 2:2–1(a)(2). We granted the City's petition for certification on the questions of liability, damages, and counsel fees. 122 *N.J.* 325, 585 *A.*2d 343 (1990).

II

■ Determination of the City's liability for breach is necessarily the first question that must be resolved in this case. Essentially, the City has argued that a municipality lacks the power to enter leases for longer than one year; or that given such power, the ordinance approving the McGuire lease controls the terms of the lease itself, and therefore the lease was subject to cancellation unilaterally by the City each year if it simply did not appropriate the necessary funds. Both the trial court and the Appellate Division rejected the City's arguments. We agree with the results reached by the lower courts and affirm the finding of the City's liability for breach substantially on the basis of the reasoning of the Appellate Division.

Both courts below determined that a municipality has the legal power to enter into a lease for real property that has a term of more than one year. Such a lease is governed by the Local Lands and Buildings Law, which provides that "[a] leasehold for a term not in excess of 50 years may be made pursuant to this act and extended for an additional 25 years by ordinance or resolution thereafter for any county or municipal public purpose." *N.J.S.A.* 40A:12–15. The scheme of municipal statutory powers envisions that a city can make a lease for longer than one year and bind itself to appropriate the funds to pay the rentals in each successive year of the lease term. For example, in *D'Ercole v. Mayor of Norwood,* 198 *N.J.Super.* 531, 535, 487 *A.*2d 1266 (1984), the Appellate Division upheld the validity of a twenty-year lease of a firehouse, where the

approving ordinance provided that rental payments "shall be made annually from budget appropriations in the manner prescribed by law pursuant to the provisions of the Local Budget Law of the State of New Jersey." Thus, a municipality would, as a practical matter, provide for funding of a long-term lease by future annual appropriations made in accord with the procedures of the Local Budget Law. Indeed, long-term leases are therefore exempted from the Local Budget Law's prohibition of expenditures without a corresponding current appropriation. *N.J.S.A.* 40A:4–57b.

■ The City has argued that a provision of the Local Public Contracts Law and regulations thereunder prohibit a municipality from making a lease for more than one year unless the municipality retains the power to cancel the lease in future years. The relevant section states:

> All multi-year leases and contracts entered into pursuant to this section ... shall contain a clause making them subject to the availability and appropriation annually of sufficient funds as may be required to meet the extended obligation, or contain an annual cancellation clause. [*N.J.S.A.* 40A:11–15.]

The applicable regulation, *N.J.A.C.* 5:30–14.5(c)4.iii, restates the requirements of the statute in substantially the same language.

However, the Local Public Contracts Law governs contracts and leases for goods and services only, and has no application to acquisitions of interests in real property. That was made clear in the analysis of the Appellate Division in *D'Ercole, supra,* 198 *N.J.Super.* at 541, 487 *A.*2d 1266. There, the court noted that the Legislature's introductory statement to a 1983 amendment to *N.J.S.A.* 40A:11–15 explained that "[t]he Legislature clearly intended leases [of real property] to be governed by the 'Local Lands and Buildings Law'" and not by the Local Public Contracts Law. Neither the present case nor *D'Ercole* involves the broader question of whether acquisitions of real property, by virtue of their exclusion from the Local Public Contracts Law, are entirely exempt from public bidding requirements. Here, it suffices to say that any open question as to public bidding for real property acquisitions is not related to the

issue of the validity of a lease term in excess of one year. Moreover, even as to contracts within the purview of *N.J.S.A.* 40A:11–15, the statute requires, in the disjunctive, a cancellation clause *or* future annual appropriations. Thus, an ordinance's reference to future appropriations cannot be equated with a right of cancellation on the part of the municipality.

 Regardless of whether the specific terms of the City's ordinance may be incorporated into the lease, or whether the ordinance's terms may prevail over those of the lease, the ordinance itself provides that the lease is valid for a twenty-year period. The ordinance authorized execution of the lease "in substantially the form" signed by McGuire; and stated that the "lease shall endure for a period of twenty (20) years." In the face of those specific terms, the additional provision that the lease would be "subject to the availability and appropriation of funds ... for the subsequent fiscal year," does not negate the twenty-year term. At most, the appropriation provision reflects the normal fiscal process by which future rental payments are to be funded. It certainly cannot be read as converting the twenty-year term lease into a year-to-year lease at the City's sole option. Any other interpretation would necessarily contradict the normal expectations and course of commercial dealings between the parties. Thus, we affirm the Appellate Division's holding that the lease was valid and that the City's failure to fund rental payments after December 1985 was a breach thereof.

### III

Because the City is liable for breach of the lease, we must now determine the issues raised by the parties concerning the amount of McGuire's recovery. In its petition for certification, the City asserts that the trial court should have required McGuire to demonstrate that he had attempted to mitigate his damages by reletting the premises. The City further argues that the trial court erred in including the value of the premises

at the end of the lease as an element of damages; and that the City's option to purchase after the first ten years of the lease would, in any case, preclude any award of damages for lost rentals after the time when the option could have been exercised. McGuire's appeal asserts that he should have been awarded a "grossed up" figure to compensate for taxability of the award. Finally, the City argues that the Appellate Division's determination that the lease permits an award of counsel fees to McGuire was incorrect.

### A

■■ On the issue of mitigation, the Appellate Division held that a lessor of commercial property is required to mitigate damages arising from breach of a lease and suggested that, on remand, the trial court should consider whether McGuire's sale of the properties should reduce the amount of his loss. We affirm the Appellate Division's holding that a commercial lessor is governed by the same rule of mitigation of damages that applies to a residential lessor. See *Sommer v. Kridel,* 74 *N.J.* 446, 378 *A.*2d 767 (1977). Further, we find that McGuire's sale of the properties in 1987 for approximately $750,000 constituted mitigation, and, because the sale price approximated the value of the future rentals, the sale effectively ended his entitlement to damages for lost rental income after the time of sale. In view of that determination, we need not reach the question of the effect of the City's purchase option under the lease.

Since this Court determined in *Sommer v. Kridel, supra,* 74 *N.J.* 446, 378 *A.*2d 767, that a residential lessor must mitigate damages arising from the breach of a lease by reasonable attempts to relet the premises, on several occasions lower courts have extended the mitigation rule to commercial leases. For example, in *Ringwood Associates Ltd. v. Jack's of Route 23, Inc.,* 153 *N.J.Super.* 294, 379 *A.*2d 508 (Law Div.1977), *aff'd on other grounds,* 166 *N.J.Super.* 36, 398 *A.*2d 1315 (App.Div. 1979), the trial court had applied the rule of mitigation to a

commercial lease of retail premises; however, the Appellate Division found that it had been unnecessary for the trial court to reach that issue, because the lessor's breach of an assignment clause was sufficient to preclude any liability on the part of the lessee. *See also Carisi v. Wax*, 192 *N.J.Super.* 536, 471 *A.*2d 439 (Dist.Ct.1983) (commercial lessor has duty to mitigate, at least in absence of any contractual provision relieving landlord of such duty). Most recently, in *Fanarjian v. Moskowitz*, 237 *N.J.Super.* 395, 568 *A.*2d 94 (1989), the Appellate Division squarely held that a commercial lessor of professional office space could not recover unpaid rents from a breaching tenant when the lessor could not demonstrate diligent efforts to relet. Those cases have correctly extended the mitigation rule to leases of commercial property.

The City has argued, in the alternative, that the sale of the property constituted McGuire's acceptance of the lessee's surrender of the premises. *See, e.g., First Wisconsin Trust Co. v. L. Weimann Co.*, 93 *Wis.*2d 258, 286 *N.W.*2d 360 (1980). However, in recent years, New Jersey and other jurisdictions have shown an increasing tendency to analogize landlord-tenant law to conventional doctrines of contract law. *See, e.g., Berzito v. Gambino*, 63 *N.J.* 460, 308 *A.*2d 17 (1973) (implied warranty of habitability and covenant to pay rent construed as mutually dependent); *Marini v. Ireland*, 56 *N.J.* 130, 265 *A.*2d 526 (1970) (landlord's implied covenant to make repairs and tenant's covenant to pay rent construed as mutually dependent; landlord's breach of covenant entitles tenant to repair and offset cost against rent); *Reste Realty Corp. v. Cooper*, 53 *N.J.* 444, 251 *A.*2d 268 (1969) (recognizing implied warranty against latent defects and of fitness of premises for lease purposes). In view of that tendency, we think it is more appropriate to consider the landlord's sale of the premises as a mitigation, rather than as an acceptance of surrender. Under either analysis, the result in this case is the same. If the landlord received a sale price that compensates for the value of the future rental income of

the property, then the lessee's liability for such rentals ends at the time of sale.

That is the situation presented by McGuire's sale of the properties. The trial court, and to some extent the Appellate Division, may have considered the 1987 sale a mitigation only insofar as it recompensed McGuire for the market value that the properties would have had at the end of the twenty-year lease term. McGuire testified that the properties would be worth approximately $7,211,000 in 2005, and that the present value of that amount at the time of trial was $747,000, or roughly the equivalent of the sale price that McGuire received. However, if the trial court intended to recompense McGuire for that "loss", or if, as the record suggests, it measured his damages by the principal payments on the mortgage he intended to obtain on the properties, the court was in error. A lessee is not a guarantor of the future market value of a lessor's property. Nor is a lessee responsible *per se* for repayment of a lessor's costs in acquiring or renovating the property, except in instances in which a landlord has actually conformed to a lessee's specified alterations that do not increase the property's overall market value for sale or lease. In this case, McGuire concededly did not close on the proposed $1.1 million mortgage, and only invested $150,000 to $175,000 for preliminary planning and renovations. Despite that limited investment, on the properties' sale in 1987, McGuire recovered the then-present value of what he estimated would be its worth in 2005 if all the planned renovations had been completed.

From another perspective, the sale price of commercial real estate can be correlated to the present value of the property's future stream of rental income. Calculation of such present value of rents is an accepted method of appraisal of income-producing properties. *See, e.g., Helmsley v. Borough of Fort Lee*, 78 *N.J.* 200, 213–14, 394 *A.*2d 65 (1978). Viewed in that light, the lessor's sale of the property recompenses him or her for that expected future income from rentals. In this case, most of the damages awarded to the lessor represented his

expected profit from the lease rentals over the twenty-year term, reduced to present value. However, when McGuire chose to sell his property in 1987 for some eight times what he had paid for it in 1982, he was compensated by the sale price for its future rentals. Whether we view the sale as a mitigation or as an acceptance of surrender, it terminates any liability of the City for unpaid rents as of the date of sale.

On remand, the trial court will need to determine initially whether McGuire should receive any damages for lost rental income for the period from September 1985 to the date of sale in 1987. McGuire apparently permitted the buyers to take possession of the properties in April or May 1987; if so, the trial court must determine whether the buyers' occupancy negates any liability of the City after that time. Finally, the present record does not reflect what steps McGuire may have taken to mitigate his damages, whether by lease or by sale, between September 1985 and April or May 1987. The lessor bears the burden of demonstrating actions taken to mitigate damages. *Sommer v. Kridel, supra,* 74 *N.J.* at 457, 378 *A.*2d 767.

### B

The limited time period during which McGuire may be able to demonstrate a loss due to breach might not in itself preclude a recovery for lost tax benefits. Because McGuire may still assert a claim for lost investment tax credits, we address the question of when, if ever, lost tax benefits would be recoverable in a breach of contract action.

Before both the trial court and the Appellate Division, there was some confusion between McGuire's claim for lost investment tax credits and his claim for a "gross up" in the damages award to compensate for the tax liability on the award itself. The trial court based the amount of damages on an assertion of the City's expert that the lease was a "tax free" transaction for McGuire. That court also denied recovery for a "gross up."

The Appellate Division interpreted McGuire's claim solely as one for a "gross up" and denied such damages, relying on *Stopford v. Boonton Molding Co., Inc.*, 56 *N.J.* 169, 265 *A*.2d 657 (1970). That court also noted that the likelihood of frequent changes in the tax laws generally would make claims for anticipated future tax benefits too speculative to be a proper element of recovery.

The damage calculations accepted by the trial court did, in fact, take McGuire's presumed investment tax credits into account. The figures proffered by both parties' experts assumed that McGuire would pay no tax on his rental income from the lease, because any tax owed would be approximately offset by McGuire's investment tax credits. The rentals awarded to McGuire would have been substantially less if the trial court had deducted taxes that McGuire, absent tax credits, would have owed on the rental income. Therefore, by denying the "gross up" claim and leaving McGuire with a taxable award approximating the "before tax" amount of rental income, the trial court essentially came to the same result as an outright denial of investment tax credits would have produced.

We hold that any claim in this case for recovery of investment tax credits is too speculative to be considered a permissible element of damages. Review of just a few salient facts regarding the lease transaction indicates the highly speculative nature of the claim. Plaintiff's expert testified that such credits were eliminated by changes to federal tax law in 1986. Therefore, even under the most favorable assumptions, McGuire might have been eligible for tax credits only for renovation expenditures made in 1985. As we noted earlier, as of August and September 1985, McGuire had not obtained the proposed mortgage to fund the renovations, and the property was far from a state of readiness even on September 5, 1985, when the City notified McGuire that it would not appropriate funds for rental payments after December 1985. Thus, there is nothing in the record to establish that McGuire actually would

have made the expenditures from which he expected to derive the tax credits within the allowable time period. Further, availability of the credits was posited on presumed offsetting income from other sources and a presumption that no other tax losses could be generated to replace the investment tax credits. The availability of the credits depends on many conjectural variables, and the credits are thus too speculative to form a basis for recovery. *See Westrich v. McBride*, 204 *N.J.Super.* 550, 499 *A.2d* 546 (Law Div.1984); *Nanavati v. Burdette Tomlin Memorial Hospital*, 645 *F.Supp.* 1217 (D.N.J.1986).

That is not to say that all potential tax benefits would be too speculative to recover. Plaintiff has noted instances in which courts of other jurisdictions have permitted lost tax benefits as an element of damages. For example, in *Walker v. Signal Companies, Inc.*, 84 *Cal.App.*3d 982, 149 *Cal.Rptr.* 119 (1978), the plaintiffs were awarded damages to compensate for a capital-gains rollover that they had lost because the defendants had not completed construction of the plaintiffs' new primary residence within the necessary time period. Similarly, in *Beggs v. Dougherty Overseas, Inc.*, 287 *F.*2d 80 (2d Cir.1961), the plaintiff would have been entitled to a tax exclusion for income from foreign sources, had not the defendant breached the employment contract. Both *Walker* and *Beggs* are distinguishable from the present case in that each involved a one-time tax loss for a definite amount; in contrast, McGuire's purported "loss" turns on presumptions about income, other transactions, and the state of the tax laws over a period of more than ten years. Further, both the trial court and the Appellate Division correctly denied any "gross up" to compensate for taxability of the award itself. *See Stopford v. Boonton Molding Co., Inc.*, *supra*, 56 *N.J.* 169, 194–95, 265 *A.2d* 657 (declining to lay down a general rule for contract cases, but acknowledging taxability of breach-of-contract recoveries); *cf. Ruff v. Weintraub*, 105 *N.J.* 233, 519 *A.2d* 1384 (1987) (measure of personal-injury damages for lost income is net after-tax income); *Bussell v. DeWalt Products Corp.*, 105 *N.J.* 223, 519 *A.2d* 1379 (1987)

(personal-injury defendant entitled to jury instruction to insure that jury does not increase verdict on mistaken assumption of taxability of award).

## C

█ The trial court denied McGuire attorneys' fees, finding no language in the lease that would support such an award. The Appellate Division, however, found that Article XVI of the lease, addressing default by the lessee, allowed recovery of "such costs as the Lessor may incur for legal expenses, attorney's fees, and for putting the demised premises in good order or preparing the same for re-rental. . . ." The Appellate Division also noted that the trial court should not permit a contingency fee and should limit any award of fees to the reasonable value of services necessary to accomplish the ends of the litigation.

It is not surprising that the Appellate Division attempted to limit strictly any award of fees, since fee awards are in derogation of the usual policy applied by New Jersey courts. *Rule* 4:42-9 requires a denial of fees in the normal course of events, providing that "[n]o fee for legal services shall be allowed in the taxed costs or otherwise," except in certain special circumstances enumerated in the Rules themselves, or when counsel fees are specifically permitted by statute. The Comment to *Rule* 4:42-9 emphasizes that the Rule's history, policy, and intent conjointly support the strict limitation of fee awards: " 'sound judicial administration will best be advanced by having each litigant bear his own counsel fee except in those few situations specially designated' " (quoting *Gerhardt v. Continental Ins. Cos.*, 48 *N.J.* 291, 301, 225 *A.*2d 328 (1966)).

New Jersey law also permits parties to a contract to agree in advance to circumstances that may shift liability for attorneys' fees. *Cohen v. Fair Lawn Dairies, Inc.*, 44 *N.J.* 450, 210 *A.*2d 73 (1965) (contractual provision for reasonable counsel fees held enforceable). However, because such contractual provisions

conflict with the common-law preference for avoiding awards of fees, they are strictly construed by our courts. For example, in *Satellite Gateway Communications, Inc. v. Musi Dining Car Co., Inc.*, 110 *N.J.* 280, 540 *A.*2d 1267 (1988), this Court held that a lease provision granting counsel fees to the landlord if the tenant defaulted, did not permit a fee award to an assignee of the original tenant.

The provision for attorneys' fees in the McGuire lease should likewise be construed strictly. The lease mentions such fees only in connection with the preparation of the premises for reletting in the event of the tenant's default. That provision permits fees only for legal services related to reletting, such as the recovery of possession of the premises or the drawing up of a new lease to replace that of the breaching tenant. Because we have held that McGuire's sale of the properties constitutes a mitigation, the lease's provision concerning attorneys' fees would entitle him to recover fees for legal services related to the sale. However, there is no equivalent provision in the lease to allow attorneys' fees in an action, such as that before us now, to recover damages for breach. Under the circumstances, and considering the general policy of strictly construing contractual fee provisions, the lease's provision in connection with reletting cannot be broadly applied to support an award of attorneys' fees in an action for damages for breach.

## IV

The judgment of the Appellate Division is affirmed in part, reversed in part, and modified in part. The case is remanded to the Law Division for redetermination of plaintiff's damages consistent with this opinion.

*For affirmance in part, reversal in part and modification in part* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN— 7.

*Opposed* —None.