914 A.2d 297 (2006)
389 N.J. Super. 542
JS PROPERTIES, L.L.C., Jonathan Schwartz and Scooter Jolley, Plaintiffs-Respondents,
v.
BROWN AND FILSON, INC., t/a Shelby's, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued November 29, 2006.
Decided December 27, 2006.
*298 Kevin M. Hahn, Hackettstown, argued the cause for appellant (Courter, Kobert & Cohen, attorneys; Mr. Hahn, of counsel; Amanda Mulvaney, on the brief).
James M. Docherty, Roseland, argued the cause for respondents (Vinick & Docherty, attorneys; Kathleen M. Lee and Mr. Docherty, on the brief).
Before Judges WEFING, C.S. FISHER and MESSANO.
The opinion of the court was delivered by
FISHER, J.A.D.
In this commercial tenancy matter, we consider but do not decide whether a tenant's claim of constructive eviction may legitimately be based upon the fact that the landlord has sued for possession because the tenant here continued in possession of the leased property for an unreasonable period of time after the filing of the landlord's suit. We, thus, affirm the dismissal of the tenant's novel constructive eviction claim but reverse and remand for a new trial on damages because the trial judge erred in excluding the tenant's expert testimony regarding the fair market sale or rental value of the leasehold, which was offered to show that the landlord did not take reasonable steps in mitigating damages.
The record reveals that the parties have been in conflict about the tenant's ability to enjoy the leased premises in Stanhope nearly from the onset of their relationship. For many years, plaintiffs Jonathan Schwartz and Scooter Jolley operated a business in the building in question. In June 1987, defendant Brown and Filson, Inc. (the tenant) purchased this business from plaintiffs; the plaintiffs retained ownership of the building and entered into a ten-year lease with the tenant.[1]
The tenant began experiencing roof leaks within the first month of the lease term. A lawsuit was commenced in the Law Division by the landlord in 1989 as a result of the tenant's withholding of rent due to the roof leaks. In 1992, the parties entered into a written settlement agreement of that suit, which, among other things, included the landlord's "recogni[tion] *299 [of] its obligation to keep the roof in repair with the intention of [l]andlord providing the [t]enant with a dry store." The agreement also included a method for testing the integrity of the roof as well as the landlord's promise to make any necessary roof repairs. In addition, the agreement declared that, in the event of future water damage,
the Tenant shall be entitled to monetary recovery in the following manner (which may be deducted from the rent):
a) the current retail value of the damaged or wet merchandise;
b) said merchandise to be picked up by the Landlord within 72 hours of notice to Landlord;
c) Tenant shall be entitled to the costs of clean-up and repairs to the area affected by the leaks;
d) costs may include Tenant's own costs of labor required for said clean-up at $20.00 per man hour[;]
e) The Tenant agrees to act reasonably and responsibly in respect to a, b, c and d hereof.
In July 1997, the parties entered into a new ten-year lease agreement. Among other things, this new lease agreement expressly obligated the landlord "to provide a water tight roof and roof water removal system to satisfactorily remove water from the roof" and declared, absent the application of an exception not relevant here, that "[s]hould any leak occur . . . the Landlord will be responsible for damages upon the same terms as set forth" in the 1992 settlement agreement.
Three or four months later, the roof again began to leak and, according to the tenant's testimony, approximately ninety-seven leaks occurred during the first three years of the 1997 lease; the landlord acknowledged that it was given notification of leaks on over twenty occasions. As a result, the tenant made deductions from its rent payments for certain expenses to which it claimed entitlement pursuant to the 1992 settlement agreement. Included among these deductions was an amount for the loss of business during a Valentine's Day sale in 2000; the tenant also recognized that on two occasions it deducted an amount based upon a labor charge in excess of the $20 per hour rate referred to in the settlement agreement.
In January 2000, work began to replace the roof, which resolved the long-standing problem with leaks. It is undisputed that there were no further leaks in the roof starting well before the landlord filed suit in the Special Civil Part on September 15, 2000.
The landlord filed suit to obtain possession of the leased premises, alleging that the tenant had not paid rent in the amount of $16,651.45; this amount represented the amount of deductions the tenant had previously made when it was burdened by roof leaks. Soon after the suit was commenced, the tenant moved for a transfer of the matter to the Law Division, citing the "complexity of the issues" and claiming a need for discovery and the joinder of additional parties and claims. The judge who was then assigned to the matter agreed with the tenant's contentions and ordered a transfer to the Law Division on October 13, 2000 for the reasons expressed in a written decision.
On November 13, 2000, the tenant filed an answer and counterclaim, which included, among other things, claims for compensatory and punitive damages based upon (1) the landlord's "false[] and malicious[]" suit that was filed, according to tenant, with "the intent and purpose to harass and prevent the proper operation" of the tenant's business and with the "ulterior motive . . . to expunge or renegotiate" the 1992 settlement agreement; (2) the landlord's *300 alleged breach of the tenant's right to quiet enjoyment of the premises; and (3) the landlord's alleged "unconscionable commercial practices and other unlawful practices" designed to terminate the tenancy.
On March 31, 2001, the tenant vacated the premises and returned the keys to the landlord. The tenant then amended its counterclaim, adding a claim which asserted that the landlord had "deprived [tenant] of the quiet enjoyment" of the premises and that the premises were rendered "substantially unsuitable for the purpose for which they were leased," which constituted tenant's "constructive eviction" from the premises.
On September 6, 2002, the landlord moved for "an order limiting issues to be decided by the jury and directing judgment in favor of the plaintiffs on breach of contract issues." The tenant now argues on appeal that the motion was procedurally deficient. Although there is merit to this point, we find the tenant was not prejudiced by the motion's inadequate description of the relief sought. The record reveals that the tenant understood that the landlord was seeking, in part, the dismissal of the constructive eviction claims and that the tenant had a full and fair opportunity to respond to the landlord's contentions. The judge also understood the landlord's motion in that way and her ruling reveals that the judge either expressly or implicitly applied the standards imposed by R. 4:6-2 and R. 4:46. We thus see no harm or prejudice to the tenant arising from the landlord's inartful motion or the procedures that followed.
In dismissing the constructive eviction claim, the trial judge focused on the undisputed fact that the roof leaks had ended prior to the tenant's departure from the premises. Certainly, if the constructive eviction claim was based upon an intrusion on the tenant's right to the quiet enjoyment caused by the water leaks, we would agree that dismissal was appropriate. The mere timing of the circumstances in that instance would militate against a finding of constructive eviction. Repairs on the roof were commenced in January 2000 and the roof was rendered "leak-free" soon thereafter. After so many roof leaks over so long a period of time, it was unreasonable for the tenant to depart the premises on March 31, 2001, more than one year after the roof was repaired. Its claim that it was constructively evicted as a result of the previous roof leaks was precluded by the tenant's continued possession of the premises for approximately one year after the problem had been cured. See, e.g., Weiss v. I. Zapinsky, Inc., 65 N.J.Super. 351, 358, 167 A.2d 802 (App.Div.1961).
However, the tenant also argued that his constructive eviction claim was based upon the landlord's suit for possession. The trial judge did not address this latter point.
Whether a constructive eviction claim may be maintained merely because a tenant has been sued for possession has not been determined in this jurisdiction. After carefully reviewing the record in light of this contention, we conclude that we need not now decide whether a constructive eviction may be based upon the landlord's commencement of litigation because the undisputed facts reveal that the tenant delayed his departure from the premises for an unreasonable period of time after being sued for possession.
A claim for constructive eviction in this State must be based upon a substantial breach of the tenant's right to the *301 quiet enjoyment of the leased premises.[2]Reste Realty Corp. v. Cooper, 53 N.J. 444, 457, 251 A.2d 268 (1969). In this State, the doctrine of constructive eviction has been held properly invoked where there has been a physical interference with the tenant's use of the premises, such as when the landlord has failed to provide heat, Higgins v. Whiting, 102 N.J.L. 279, 280-81, 131 A. 879 (Sup.Ct.1926), or repair defective plumbing, McCurdy v. Wyckoff, 73 N.J.L. 368, 369, 63 A. 992 (Sup.Ct.1906), or prevent water seeping through exterior walls, Reste Realty, supra, 53 N.J. at 458-59, 251 A.2d 268, or fix a leaky roof, Weiss, supra, 65 N.J.Super. at 355, 167 A.2d 802. But our courts have never applied this doctrine to a nonphysical interference with the right of quiet enjoyment, such as is argued here.
Even in jurisdictions that recognize the theory asserted by the tenant, it is generally understood that a landlord's filing of an eviction suit is not alone sufficient to support a tenant's constructive eviction claim. See, e.g., Restatement (Second) Property, § 4.3(d) (1977). Some courts have held, however, that a tenant may have a valid basis for a constructive eviction claim when there is evidence that the suit was brought with malice or in bad faith or when there was a lack of probable cause for the suit. See, e.g., Guntert v. City of Stockton, 55 Cal.App.3d 131, 126 Cal.Rptr. 690, 694-95 (1976); Kuiken v. Garrett, 243 Iowa 785, 51 N.W.2d 149, 155-56 (Iowa 1952); Roseneau Foods, Inc. v. Coleman, 140 Mont. 572, 374 P.2d 87, 91 (1962); D.M. Dev. Co. v. Osburn, 51 Or. App. 207, 625 P.2d 157, 158 (1981); Kohl v. PNC Bank Nat'l Assoc., 863 A.2d 23, 24, 27-28 (Pa.Super.2004), leave to appeal granted, 584 Pa. 695, 882 A.2d 479 (2005). One court has held that a landlord's demand letters are insufficient and that a single suit alone is not sufficient, holding that there must be "substantial evidence of repeated acts of malice or bad faith" for there to be a "nonphysical constructive eviction." El Paso Nat. Gas Co. v. Kysar Ins. Agency, Inc., 98 N.M. 86, 645 P.2d 442, 444 (1982) (emphasis added). Other jurisdictions have held that even a malicious or non-meritorious eviction suit cannot support a constructive eviction claim. See, e.g., Weisman v. Middleton, 390 A.2d 996, 1001-02 (D.C.App.1978); Rahman v. Federal Management Co., Inc., 23 Mass. App.Ct. 701, 505 N.E.2d 548, 550 (1987). We question whether the recognition of a constructive eviction claim based upon the malicious filing of a landlord's suit or upon the filing of a suit without probable cause would represent a salutary addition to our common law because, as persuasively observed by the Massachusetts court in Rahman, such claims would have a tendency to chill a landlord's right to lawfully seek possession for fear of retaliation in the form of a constructive eviction claim. Id. at 551; see also D.M. Dev., supra, 625 P.2d at 158. We also question the necessity of such a claim because it presupposes that the mere filing of one or more suits against a tenant has the tendency to oust the tenant from the premises. Since our laws and procedures do not permit the judicial removal of a tenant without notice and an opportunity to be heard, we question the reasonableness of a tenant's decision *302 to abandon a leasehold when merely faced with a lawsuit, particularly when there has been no showing that the landlord possesses far greater economic power than possessed by the tenant.[3]
However, we need not further consider whether our common law should recognize a constructive eviction claim based upon the tenant being haled into court on a malicious or non-meritorious suit for possession because the tenant here did not immediately or within a reasonable period of time vacate the premises as a result of the landlord's lawsuit. Instead, the tenant met the suit head on, sought its transfer to the Law Division and then filed a multi-count counterclaim, while remaining in the premises for more than six months after the suit was commenced. Because of its unreasonable delay in departing from the premises when sued by the landlord, the tenant's constructive eviction claim, even if maintainable in this jurisdiction, could not succeed.
In Reste Realty, the Court reaffirmed the common law rule that a tenant's continued occupation of the leasehold for an unreasonable period of time after the basis for the constructive eviction arose would warrant a loss of the claim. 53 N.J. at 461, 251 A.2d 268. Ascertaining what constitutes an unreasonable delay in leaving the premises "depends upon the circumstances of each case." Ibid. In Reste Realty, there were repeated incursions of water into the leased premises. In the midst of these problems, the landlord's building manager died, and, as explained by the Court,
the tenant complained, patiently waited, hoped for relief from the landlord, and tried to take care of the water problem that accompanied the recurring rainstorms. But when relief did not come and the "crowning blow" put five inches of water in the leased offices and meeting rooms on December 20, 1961, the tolerance ended and the vacation came ten days later after notice to the landlord. The trial court found as a fact that under the circumstances such vacation was within a reasonable time, and the delay was not sufficient to establish a waiver of the constructive eviction. We find adequate evidence to support the conclusion. . . .
[53 N.J. at 461-62, 251 A.2d 268.]
In Weiss, we held that a tenant's constructive eviction claim was not sustainable when the tenant remained in the premises for slightly more than four months following the repair of the roof, and deemed that delay to be unreasonable. 65 N.J.Super. at 358, 167 A.2d 802. In Duncan Dev. Co. v. Duncan Hardware, 34 N.J.Super. 293, 298-99, 112 A.2d 274 (App.Div.1955), we held that the tenant's continued possession of the premises "after the landlord's failure to comply with his covenant to install a separate heating unit and [the parties'] concurrence in the substituted arrangement whereby the tenant was for four years allowed a reduction in rent during the winter mothers operated as a waiver of the covenant."
Guided by these past experiences, we are satisfied that the tenant here failed to depart the premises within a reasonable time following the event which it now claims brought about its constructive eviction. As we have observed, the landlord's complaint was filed on September 15, 2000. Rather than depart, the tenant remained in the premises, fought back and, indeed, *303 guaranteed that the litigation would not be rapidly or summarily resolved by successfully obtaining the action's transfer to the Law Division. Following transfer, the tenant filed an answer and counterclaim, and the parties engaged in discovery. It was not until March 31, 2001 that the tenant removed itself from the premises, over six months after the filing of the landlord's complaint. Even if the tenant could maintain a constructive eviction action based upon a landlord's filing of an unmeritorious or malicious suit for possession, an issue which we need not presently resolve, we conclude that the tenant's continued occupation of the premises for more than six months following the filing of the landlord's alleged malicious suit was unreasonable and warranted a dismissal of the action. We, thus, affirm the order that dismissed the tenant's constructive eviction claim.[4]
We will, however, remand for a new trial on the question of whether the landlord took reasonable steps to mitigate its damages because we find that the trial judge took too restrictive a view of what evidence is relevant to that question.
In overruling a longstanding common law principle, the Court in Sommer v. Kridel, 74 N.J. 446, 378 A.2d 767 (1977) held for the first time that a landlord is under a duty to mitigate damages caused by a defaulting residential tenant. This doctrine was later held to apply to commercial leaseholds. See McGuire v. City of Jersey City, 125 N.J. 310, 320, 593 A.2d 309 (1991); Fanarjian v. Moskowitz, 237 N.J.Super. 395, 406, 568 A.2d 94 (App.Div. 1989). The burden of proving the reasonableness of the landlord's mitigation efforts was placed on the landlord, Sommer, supra, 74 N.J. at 457, 378 A.2d 767; McGuire, supra, 125 N.J. at 316, 593 A.2d 309, and in assessing whether the landlord has satisfactorily carried this burden, the factfinder must consider, among other factors, "whether the landlord, either personally or through an agency, offered or showed the [premises] to any prospective tenants, or advertised it in local newspapers," Sommer, supra, 74 N.J. at 458-59, 378 A.2d 767. The Court recognized that the issue is fact-sensitive, observing that "there is no standard formula for measuring whether the landlord has utilized satisfactory efforts in attempting to mitigate damages, and each case must be judged upon its own facts." Id. at 459, 378 A.2d 767.
In pretrial rulings, the trial judge reserved to herself the interpretation of the lease but held that a jury would be required to resolve the damage disputes, including the question of whether the landlord had taken reasonable steps to mitigate. At trial, the tenant planned on calling an expert to testify about the fair market rental and sale value of the premises. However, the judge sustained the landlord's objection, finding that this expert testimony was irrelevant. We conclude the judge was mistaken in this regard.
As indicated above, the tenant removed itself from the premises on March 31, 2001. The landlord, however, did not find a new tenant or a purchaser for an extended period of time. It was not until July 2002 that the landlord reached an agreement with a third party for the purchase of *304 the building for $1,580,000. Because of the considerable passage of time from the tenant's departure to the sale of the building, the tenant argued that the landlord failed to take reasonable steps to mitigate the damage.
In attempting to show that its mitigation efforts were reasonable, the landlord called James Spada, a vice-president of Weichert Realtors; Weichert was retained by the landlord in March 2001 to obtain a purchaser of or a tenant for the building. Spada testified that the listing agreement set "asking price[s]" of $2,100,000 for the sale of the building and $8 per square foot for the rental of the premises. However, Spada also testified that a sale price of $1,800,000 and a rental at the rate of $7 per square foot were "achievable." As observed, it took approximately fifteen months for the landlord to find a buyer for an amount far less than Weichert's "asking price." Following Spada's testimony, the judge barred the tenant from calling its expert to testify that a rental at the rate of $6 per square foot represents a fair market price.
It was incongruous for the trial judge to have permitted the landlord to provide expert testimony as to the fair market rental and sale value of the property in asserting the reasonableness of the landlord's efforts at mitigation while thereafter precluding the tenant from presenting the same type of evidence. The judge based her decision to bar the tenant's expert testimony on the fact that there was no dispute that the landlord had retained a realtor to obtain a buyer or tenant in seeking to mitigate and concluded that it was reasonable for the landlord to rely upon the realtor's advice. We recognize that the landlord's reliance upon the realtor's advice is something a factfinder may consider in determining the reasonableness of the landlord's efforts. By the same token, it is relevant to the resolution of the fact-sensitive mitigation issue to consider whether the realtor hired by the landlord adopted a reasonable approach in marketing the property  fixing an appropriate listing price is undoubtedly a critical aspect of such a marketing effort and testimony about the reasonableness of the listing price is certainly relevant.
Relevant evidence is that which has a "tendency in reason to prove or disprove any fact of consequence" to the determination of the action, N.J.R.E. 401, and unless there is some other basis for excluding it, all relevant evidence is admissible, N.J.R.E. 402. Relevance turns on whether there is a "logical connection" between the evidence offered and the issues in question. Verdicchio v. Ricca, 179 N.J. 1, 33, 843 A.2d 1042 (2004). In defining what is meant by a "logical connection," we held in State v. Hutchins, 241 N.J.Super. 353, 358, 575 A.2d 35 (App.Div.1990) that such a nexus exists when "the thing sought to be established is more logical with the evidence than without it." One commentator has indicated that this test is met even when the proffered evidence "obliquely" supports the existence of a fact in issue. Biunno, Current N.J. Rules of Evidence, comment 1 to N.J.R.E. 401 (2006).
The price sought by the realtor on behalf of the landlord was a factor to be considered in weighing the reasonableness of the landlord's marketing efforts. Admittedly it was not the only factor, but evidence as to the reasonableness of the price at which the property was listed for sale or rental amply meets the test of what constitutes relevant evidence. Accordingly, we conclude that the trial judge mistakenly excluded the expert testimony offered by the tenant.
In the same vein, we also reject the judge's conclusion that a landlord need only retain a competent realtor and may *305 simply rely upon that realtor's advice. Certainly, that is a factor to be considered, but it is not conclusive. In taking such an approach, the landlord was not entitled to hide behind the alleged unreasonable or unsuccessful steps taken by its realtor, and the judge's conclusion that, absent fraud or collusion, a landlord acts reasonably when adhering to a realtor's advice was mistaken. Here, the realtor admittedly listed the property at what is acknowledged to be an "asking price" with the assumption that an agreement with a third party would be reached at something lower. Although there was evidence that third parties expressed interest in the property, no agreement was reached for either a sale or a rental for approximately fifteen months following the tenant's departure. During that period, the landlord twice renewed its listing agreement with the realtor at the same sale and rental prices despite the fact that the listing had failed to generate either a buyer or a tenant. It is not conclusive in that circumstance to assume, as did the trial judge, that the landlord's adherence to the realtor's advice was reasonable. Considering the passage of over one year during which the landlord and its realtor persisted in the same asking price, a factfinder could conclude that the landlord had ceased to act reasonably in seeking to mitigate the damage; indeed, the factfinder would be entitled to find, in sifting through the expert testimony presented by both sides, that the initial asking price was too exorbitant and rendered unreasonable the landlord's marketing efforts. We intimate no view in this regard; it suffices to say that the tenant's expert had relevant evidence to provide on these questions and the trial judge mistakenly barred that testimony, thus militating a new trial on damages.
The order of December 18, 2002, which dismissed the tenant's constructive eviction claim, is affirmed; the judgment of June 27, 2005, which awarded damages to the landlord in the amount of $380,332.79, is vacated. The matter is remanded for a new trial.[5] We do not retain jurisdiction.
NOTES
[1] Schwartz and Jolley later formed JS Properties, L.L.C. when entering into a subsequent lease agreement with the tenant in 1997. For convenience, we will hereafter refer to these parties collectively as "the landlord."
[2] The 1997 lease contains an express provision guaranteeing the tenant's right to quiet enjoyment. Paragraph 26 of the 1997 lease states that "[t]he Landlord covenants and represents that the Landlord is the owner of the premises herein leased and has the right and authority to enter into, execute and deliver this lease; and does further covenant that the Tenant on paying the rent and performing the conditions and covenants herein contained, shall and may peaceably and quietly have, hold and enjoy the leased premises for the term aforementioned."
[3] For that reason, we conclude that the tenant's assertion of a fear that the sheriff would arrive and padlock the premises was an unreasonable basis for a constructive eviction because such an occurrence could not lawfully occur in the absence of a valid direction from the court.
[4] We recognize that the trial judge did not rule upon this aspect of the tenant's constructive eviction claim. However, appeals are taken from orders not opinions. See Do-Wop Corp. v. City of Rahway, 168 N.J. 191, 199, 773 A.2d 706 (2001). For the reasons we have expressed, the trial judge correctly dismissed the constructive eviction claim even though she did not address this aspect of the tenant's counterclaim. See Isko v. Planning Bd. of Livingston, 51 N.J. 162, 175, 238 A.2d 457 (1968).
[5] After the trial judge barred the tenant's expert testimony, which left the tenant with no evidence to submit on the mitigation claim other than that which was extracted by way of the cross-examination of Spada, the tenant consented to a dismissal of the jury and the resolution of the issues by the trial judge. We conclude that in fairness the right to trial by jury on this issue should not be deemed waived by what occurred at trial in the wake of the judge's erroneous ruling.