**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4138-23

SEBASTIANO PISCIOTTA
and LINDA PISCIOTTA,

     Plaintiffs-Appellants,

v.

5 TERRE, LLC, NICOLA
DIPALMA, MARIA DIPALMA,
and STEFANO BOSETTI,[1]

     Defendants-Respondents.

_____

Argued November 6, 2025 – Decided January 26, 2026

Before Judges Bishop-Thompson and Puglisi.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-5605-18.

Richard J. Allen, Jr., argued the cause for appellants (Kipp & Allen, LLC, attorneys; Richard J. Allen, Jr., on the brief).

_____

[1] Improperly plead as Stefano Bossetti.

Jennifer Alampi argued the cause for respondents (Law Office of Carmine R. Alampi, LLC, attorneys; Jennifer Alampi, on the brief).

PER CURIAM

Following a bench trial, plaintiffs Sebastiano Pisciotta and Linda Pisciotta appeal from the July 2, 2024 order entering judgment in favor of defendants 5 Terre, LLC (5 Terre), Nicola DiPalma, Maria DiPalma, and Stefano Bosetti on plaintiffs' affirmative claims; and entering judgment of $408,000 in favor of defendants on defendants' counterclaims. We affirm.

I.

Plaintiffs co-owned a commercial property in Rutherford (the property or premises) since 1992. Prior to April 2017, Sebastiano[2] was aware of significant water intrusion into the property's sidewalk and basement area, where the electrical panels, gas line, water line, and main sprinkler were located. He neither had the property inspected by an architect or engineer nor took any steps to remedy the issues.

In March 2017, the parties entered into a sixty-month commercial lease for the property's first-floor restaurant space from April 1, 2017 to March 31,

---

[2] Because some of the parties share a common surname, we refer to them by their first names, with no disrespect intended.

2022, with rent totaling $258,348. The lease listed Sebastiano and Linda as landlords; 5 Terre, the corporate entity that operated the restaurant, as a tenant; and Nicola, Maria, and Bosetti as guarantors. At that time, Nicola, Maria, Bosetti, and Ruggerio Pucci had membership interests in 5 Terre.[3]

Bosetti initially ran the day-to-day operations of the restaurant, which was not doing well. Pucci purchased the other members' interests in 5 Terre, hired a business manager, and revised the business model, which immediately increased the restaurant's business. Restaurant sales were about $15,000 in October 2017, and grew to $24,000 in November, $35,000 in December, and $45,000 in January 2018. Although sales were $26,000 in February, Pucci attributed the decrease to the shorter month.

Pucci's extensive experience in the restaurant business led him to believe either someone else was using the property's water, electricity, and gas, or the meter was not functioning properly. In February 2018, he contacted the electric and gas utility provider to replace the electrical meter. When he and the utility worker went into the basement where the meter was located, where Pucci had "never been before," he observed "water coming down" and "through the wall."

---

[3] Although Pucci was the managing member of 5 Terre, he was not a party to this litigation.

A-4138-23

The floor was cracked, not level, full of debris, and had water the height of "two or three fingers" on it. According to Pucci, the utility worker refused "to touch anything there because [he was] afraid of getting electrocuted."

That same month, Pucci attempted to have the water company replace its meter, but it too refused. In April 2018, he hired an electrician who reported the "electrical box was completely destroyed and full of water" and also refused to service it.

After meeting with the electrician, Pucci engaged three professionals—an architect, an architect/professional engineer, and a structural engineer (defendants' experts) to assess the issues. Their individual reports identified dangerous conditions in the building, including "water infiltration, wet walls, standing water, water in the electrical panel, . . . rust and corrosion on steel beams and columns, corroded sprinkler lines, deteriorated gas line, notched beams, notched floor joists under the restaurant, cracks in the rear foundation wall, exposed rebar[,] and spalling concrete." Plaintiffs, in turn, engaged an architect, who generally agreed with defendants' experts' observations and prepared design drawings to address the deficiencies noted in their reports.

On June 8, 2018, defendants sent plaintiffs a letter asserting they were constructively evicted from the property because the totality of the conditions

A-4138-23

"render[ed] the premises uninhabitable and unfit for its intended purpose" and caused the restaurant to shut down that day. The letter listed the structural issues with the property and enclosed the experts' written reports. The utility company then shut off the building's electric and gas service from June 18 to October 24, 2018, a period of 128 days, until the main gas pipe was replaced.

On July 19, 2018, plaintiffs filed a verified complaint seeking an injunction to: require defendants to provide plaintiffs with a key to the property and restrain and enjoin defendants from denying plaintiffs access to the property (count one); return any property or improvements removed from the property and prevent further removal of any property or improvements from the property (count two); enforce a landlord's lien (count three); and a declaratory judgment that defendants were liable for all rent reserved in the lease (count eight). Plaintiffs also sought monetary damages for: unpaid rent (counts four and five); and attorneys' fees and costs (counts six and seven). After adjudicating the parties' requests for injunctive relief, which are not at issue in this appeal, the court transferred the matter from the Chancery Division, General Equity Part, to the Law Division.

Defendants answered the complaint, denying the allegations and counterclaiming: constructive eviction (count one); fraud (count two); lease and

personal guaranty voided by plaintiffs' fraud (count three); misrepresentation by plaintiffs (count four); and unlawful distraint (count five). Plaintiffs answered the counterclaims, denying all allegations.

On August 31, 2018, the Borough of Rutherford (the Borough) issued a notice of violation requiring plaintiffs to "replace all corroded piping, fittings[,] and the main [outside screw and yoke] valves" and make structural repairs to the basement and sidewalk because they were "unsafe structure[s]." Abatement was initially required by October 1, 2018, which was extended several times. The abatement had to be completed in order for a certificate of occupancy (CO) to issue. In December 2018, the Borough Fire Official extended the time to abate the main sprinkler line defect to February 15, 2019, "provid[ed] the first floor and basement tenant space remain[ed] vacant."

The main sprinkler line and valves were repaired in January 2019, and the sidewalk and structural repairs were completed in May 2019. A temporary certificate of occupancy (TCO) was issued on June 12, 2019. The TCO stated: "No occupancy allowed until all UCC [Uniform Construction Code] violations have been abated," which also required the Borough to inspect the property and confirm abatement of the UCC violations. The Borough issued the CO on February 21, 2020, permitting the restaurant space to be occupied.

A-4138-23

At trial, both parties presented economic experts who reached "vastly different conclusions regarding the proposed lost profits." Defendants' economic expert testified defendants sustained lost profits between $1,263,658 and $1,776,222. Plaintiffs' economic expert concluded defendants incurred lost profits between $18,000 and $20,000.

After considering testimony and the parties' written summations, the court entered judgment against plaintiffs and in favor of defendants on both plaintiffs' affirmative claims and defendants' counterclaims. The July 2, 2024 order was accompanied by a comprehensive written opinion detailing the court's factual findings and conclusions of law, in which it found defendants were constructively evicted from the property. With respect to damages, the court awarded $390,000 in lost capitalization and $18,000 in lost profits, for a total of $408,000. Plaintiffs timely moved for reconsideration, which was denied by the August 16, 2024 order.[4] On appeal, plaintiffs challenge the trial court's finding of constructive eviction and its calculation of damages.

---

[4] Although the August 16, 2024 order is listed in plaintiffs' notice of appeal, they did not brief this issue on appeal. "An issue not briefed on appeal is deemed waived." Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011). In addition, because we affirm the trial court's July 2, 2024 order, we need not reach the issue of whether the trial court abused its discretion in denying plaintiffs' motion for reconsideration.

II.

"Final determinations made by the trial court sitting in a non-jury case are subject to a limited and well-established scope of review." D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013) (quoting Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011)). Appellate courts "give deference to the trial court that heard the witnesses, sifted the competing evidence, and made reasoned conclusions." Allstate Ins. Co. v. Northfield Med. Ctr., P.C., 228 N.J. 596, 619 (2017) (quoting Griepenburg v. Twp. of Ocean, 220 N.J. 239, 254 (2015)). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Cesare v. Cesare, 154 N.J. 394, 412 (1998) (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). "That is so because an appellate court's review of a cold record is no substitute for the trial court's opportunity to hear and see the witnesses who testified on the stand." Balducci v. Cige, 240 N.J. 574, 595 (2020).

Accordingly, "findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare, 154 N.J. at 411-12 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). An appellate court "may not overturn the trial court's fact findings unless [it concludes] that those findings are 'manifestly unsupported' by the

8

'reasonably credible evidence' in the record." Balducci, 240 N.J. at 595 (quoting Seidman, 205 N.J. at 169). "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

We first address plaintiffs' claim the court erred in finding constructive eviction. They argue: defendants were not deprived of the right to use the rental space; defendants did not expeditiously move out of the property; the length of time it took to make repairs was irrelevant because defendants had already vacated the property; and defendants' claim of constructive eviction was subterfuge.

Under the rule of constructive eviction, when a landlord's "act or omission . . . renders the premises substantially unsuitable for the purpose for which they are leased, or which seriously interferes with the beneficial enjoyment of the premises, [it] is a breach of the covenant of quiet enjoyment and constitutes a constructive eviction of the tenant." Reste Realty Corp. v. Cooper, 53 N.J. 444, 457 (1969). "What amounts to a constructive eviction is a question of fact." Gottdiener v. Mailhot, 179 N.J. Super. 286, 293 (App. Div. 1981) (citing Weiss v. I. Zapinsky, Inc., 65 N.J. Super. 351, 357 (App. Div. 1961)).

A-4138-23

A finding of "constructive eviction . . . must be based upon a substantial breach of the tenant's right to the quiet enjoyment of the leased premises." JS Props., L.L.C. v. Brown & Filson, Inc., 389 N.J. Super. 542, 548 (App. Div. 2006). In Berzito v. Gambino, our Supreme Court outlined several non-exhaustive factors for a court to consider when determining whether there was a breach of the covenant of habitability to support a claim for constructive eviction:

> 1. Has there been a violation of any applicable housing code or building or sanitary regulations?
>
> 2. Is the nature of the deficiency or defect such as to affect a vital facility?
>
> 3. What is its potential or actual effect upon safety and sanitation?
>
> 4. For what length of time has it persisted?
>
> 5. What is the age of the structure?
>
> 6. What is the amount of the rent?
>
> 7. Can the tenant be said to have waived the defect or be estopped to complain?
>
> 8. Was the tenant in any way responsible for the defective condition?
>
> [63 N.J. 460, 470 (1973).]

Upon a constructive eviction, a tenant may be authorized to vacate the premises without further liability to pay rent under the lease. See Reste Realty Corp., 53 N.J. at 459-60. "[A] tenant who declares the landlord in breach of a covenant of quiet enjoyment . . . need not vacate but must vacate if it seeks to terminate the lease and avoid further rent payments." Harel Assocs. v. Cooper Healthcare Pro. Servs., Inc., 271 N.J. Super. 405, 408 (App. Div. 1994).

However, "[a] tenant who continues to occupy the premises for an unreasonable length of time after an act which constitutes constructive eviction[] waives the eviction and may not thereafter abandon the premises and assert eviction." Weiss, 65 N.J. Super. at 357; accord Reste Realty Corp., 53 N.J. at 461 ("The general rule is, of course, that a tenant's right to claim a constructive eviction will be lost if [the tenant] does not vacate the premises within a reasonable time after the right comes into existence."); see also JS Props., L.L.C., 389 N.J. Super. at 550-51 (finding a six-month occupancy after alleged constructive eviction was an unreasonable delay); Duncan Dev. Co. v. Duncan Hardware, Inc., 34 N.J. Super. 293, 298-99 (App. Div. 1955) (rejecting constructive eviction claim in part because the "tenant's continuance in possession operated as a waiver").

In addressing the Berzito factors, the trial court found:

A-4138-23

[T]here were violations of the uniform construction code (water on the electrical box, standing water in front of the electrical box), conditions that affected vital facility (corroded sprinkler main line, corroded [outside screw and yoke] valves for the sprinkler system, corroded main gas pipe requiring gas shut down), and safety concerns (compromised structural columns and beams, floor joists and foundation wall cracks as well as potential electrical shock and fire hazards and hazards associated with compromised gas lines). All engineers that inspected the premises, including those hired by [p]laintiffs, agreed that structural repairs were required. [The electric and gas utility provider] found that the main gas line required replacement. The Borough . . . fire official required the sprinkler main line and [outside screw and yoke] valves to be replaced. The Borough . . . required the "unsafe conditions" relating to the sidewalk and basement structural components, to be repaired. It took [p]laintiff[s] almost a year to complete the repairs and until February 2020 for the CO to be issued so that the space could be occupied. There was no evidence presented that [d]efendant was in any way responsible for the deficient conditions.

[(Emphasis omitted).]

Plaintiffs argue defendants were not deprived of the right to use the property because neither the experts nor the Borough told them the property was unsafe to continue operating the restaurant. This contention is unsupported in the record as detailed by the trial court. The property issues involved a risk of electric shock, fire hazards, and compromised gas lines, all of which created an "unsafe structure" as reflected in the Borough's initial permit. This argument

12

also disregards the fact that ten days after defendants' notice of constructive eviction, the gas was shut off because of these hazardous conditions, which inarguably prevented defendants from operating the restaurant. And while plaintiffs' expert testified the repairs would have only taken two weeks, this is belied by the fact that the abatement was not completed for almost a year.

Plaintiffs also contend defendants failed to move out expeditiously after sending the notice of constructive eviction. This argument is unpersuasive because, as the trial court noted, plaintiffs filed a dispossession action and were granted injunctive relief barring defendants from removing their property from the premises.

We next turn to plaintiffs' challenge to the court's calculation of damages, wherein they contend the judge ignored well-established standards for damage calculation, ignored the losses incurred by 5 Terre, and provided duplicative recovery. We are unpersuaded by these arguments because they misapprehend the court's calculation of damages.

"Generally, an award of damages is to be left to the sound discretion of the trier of fact . . . and such awards should be upset for excessiveness only in clear cases." Geherty v. Moore, 238 N.J. Super. 463, 479 (App. Div. 1990) (internal citation omitted). "When reviewing the amount of a damage award, an

A-4138-23

appellate court should show appropriate deference to the trial court's 'feel of the case.'" Carey v. Lovett, 132 N.J. 44, 66 (1993) (quoting Baxter v. Fairmont Food Co., 74 N.J. 588, 600 (1977)). "So long as the record supports a reasonable estimate of damages, based upon more than mere speculation, a damage award can be affirmed." Borough of Fort Lee v. Banque Nat. de Paris, 311 N.J. Super. 280, 291 (App. Div. 1998); see also Mosley v. Femina Fashions, Inc., 356 N.J. Super. 118, 128 (App. Div. 2002) (explaining the "law abhors damages based on mere speculation") (quoting Caldwell v. Haynes, 136 N.J. 422, 442 (1994)). However, "courts will fashion a [damages] remedy even though the proof on damages is inexact" when "a wrong has been committed, and it is certain that damages have resulted." Kozlowski v. Kozlowski, 80 N.J. 378, 388 (1979).

A plaintiff must prove a loss or injury to be entitled to an award of compensatory damages. Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 41 n.1 (1984). A plaintiff is only required to "prove damages with such certainty as the nature of the case may permit, laying a foundation which will enable the trier of the facts to make a fair and reasonable estimate." Lane v. Oil Delivery, Inc., 216 N.J. Super. 413, 420 (App. Div. 1987).

The trial court found "[p]laintiffs failed to maintain the building, utility lines, and structural components of the basement[ and] failed to remedy the

14

known water intrusion problem," and "failed to disclose the[se conditions] to . . . [d]efendants, thus, inducing them into the execution of the lease and investment in 5 Terre." In fixing an amount of compensatory damages, the court considered the losses proximately caused by plaintiffs' conduct and breach of contract, which included the loss of defendants' investment in the restaurant. The court found Pucci's credible, unchallenged testimony established "he and his initial partners in 5 Terre[] . . . made an initial investment of $120,000[] to capitalize the company." Pucci then purchased the partners' interests, "thus[] allocating the full capitalization amount to him." Pucci also "personally loaned the company $270,000[]."

As to lost profits, defendants' expert testified to a range between $1,263,658 and $1,776,222 and plaintiffs' expert opined a range between $18,000 and $20,000. The trial court noted it

> cannot consider damages that are speculative in nature. Both parties offered experts in financial analysis who were duly qualified and testified in the opinion of this court in a credible manner. The variance in opinion caused this [c]ourt to pause in determining lost profits. Additionally, this [c]ourt recognizes the time period in which these events occur; specifically, pre[-]pandemic and projected through the pandemic. While the [c]ourt does not know how this business would have fared during the pandemic, it is well known to the [c]ourt that the pandemic had significant impact in the food service industry; especially fine dining. As a result, beyond

15

[p]laintiffs['] admission of lost profits of $18,000[] to $20,000[], this [c]ourt can consider no more than that.

As the court explained, it awarded damages to compensate defendants for the lost investment totaling $390,000 plus lost profits of $18,000. Because this figure eschewed speculative lost profits and did not provide duplicative damages, we discern no abuse of discretion in the award.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

16

A-4138-23